[No. S162823. Jan. 28, 2010.]

THE PEOPLE, Plaintiff and Respondent, v.
RICHARD McKEE, Defendant and Appellant.

1180

**COUNSEL**

Stephen M. Hinkle, under appointment by the Supreme Court, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Barry Carlton, Steve Oetting and Bradley A. Weinreb, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**MORENO, J.**—Proposition 83, passed by the voters in November of 2006, modified the terms by which sexually violent predators (SVP's) can be released from civil commitment under the Sexually Violent Predators Act (SVP Act or Act; Welf. & Inst. Code, § 6600 et seq.). In essence, it changes the commitment from a two-year term, renewable only if the People prove to a jury beyond a reasonable doubt that the individual still meets the definition

of an SVP, to an indefinite commitment from which the individual can be released if he proves by a preponderance of the evidence that he no longer is an SVP.

Defendant, who is subject to indeterminate commitment pursuant to Proposition 83, challenges the law on several constitutional grounds: that it violates the due process and equal protection clauses of the Fourteenth Amendment of the United States Constitution and that it violates the ex post facto clause, article I, section 10 of the United States Constitution. Like the Court of Appeal, we conclude that defendant's due process and ex post facto challenges are without merit. As for the equal protection challenge, we conclude that the state has not yet carried its burden of demonstrating why SVP's, but not any other ex-felons subject to civil commitment, such as mentally disordered offenders, are subject to indefinite commitment. As explained below, we remand to the trial court to permit the People the opportunity to justify the differential treatment in accord with established equal protection principles. (See *In re Moye* (1978) 22 Cal.3d 457 [149 Cal.Rptr. 491, 584 P.2d 1097].)

## I. FACTUAL AND PROCEDURAL BACKGROUND

On November 8, 2004, a petition was filed to establish Richard McKee as an SVP within the meaning of the Act. The petition alleged McKee was "a person who has been convicted of a sexually violent offense against two or more victims for which he was sentenced and who has a diagnosed mental disorder that makes him a danger to the health and safety of others, in that it is likely he will engage in sexually violent predatory criminal behavior." It alleged he had been convicted of two counts of committing lewd and lascivious acts on a child under the age of 14 (Pen. Code, § 288, subd. (a)). One victim was an 11-year-old girl and the other was an eight-year-old girl.[1] The petition requested that McKee be committed to the custody of the State Department of Mental Health (DMH) for a period of two years.

On February 16, 2007, McKee demurred to the petition on the ground that the Act, as amended on November 7, 2006, by the voters' passage of Proposition 83, was unconstitutional. The trial court overruled the demurrer.

On March 5, 2007, an amended petition was filed restating the original petition's factual allegations and requesting that McKee be committed to an indeterminate term pursuant to the amended Act. On March 12, following a five-day trial, the jury returned a verdict finding McKee was an SVP within

---

[1] At trial, the evidence showed McKee had been convicted in 1991 for committing lewd acts against an 11-year-old babysitter and in 1998 for committing lewd acts against his eight-year-old niece.

the meaning of the Act. On March 13, the trial court issued an order committing McKee to the custody of the DMH for an indeterminate term pursuant to the Act.

McKee timely filed a notice of appeal. The court rejected McKee's claims that the indeterminate commitment instituted by Proposition 83 violated federal or state due process, ex post facto or equal protection provisions. The court also rejected McKee's challenge to the sufficiency of the evidence and to the adequacy of the jury instructions. We granted review, and subsequently limited the issues to whether the Act as amended by Proposition 83 violated McKee's constitutional rights under the due process, equal protection, and ex post facto clauses.[2]

## II. THE SVP ACT AND PROPOSITION 83

The Act, as originally enacted (Stats. 1995, ch. 763, § 3, p. 5922), provided for the involuntary civil commitment for a two-year term of confinement and treatment of persons who, by a unanimous jury verdict after trial (Welf. & Inst. Code, former §§ 6603, subd. (d), 6604),[3] are found beyond a reasonable doubt to be an SVP (former § 6604). (*People v. Williams* (2003) 31 Cal.4th 757, 764 [3 Cal.Rptr.3d 684, 74 P.3d 779]; *Hubbart v. Superior Court* (1999) 19 Cal.4th 1138, 1143, 1147 [81 Cal.Rptr.2d 492, 969 P.2d 584] (*Hubbart*).) A person's commitment could not be extended beyond that two-year term unless a new petition was filed requesting a successive two-year commitment.[4] (Former §§ 6604, 6604.1; *Cooley v. Superior Court* (2002) 29 Cal.4th 228, 243, fn. 5 [127 Cal.Rptr.2d 177, 57 P.3d 654].) On filing of a recommitment petition, a new jury trial would be conducted at which the People again had the burden to prove beyond a reasonable doubt that the person was currently an SVP. (Former §§ 6604, 6605, subds. (d), (e).) As was stated in *People v. Munoz* (2005) 129 Cal.App.4th 421, 429 [28 Cal.Rptr.3d 295]: "[A]n SVP extension hearing is not a review hearing. . . . An SVP extension hearing is a new and independent proceeding at which . . . the [People] must prove the [committed person] meets the [SVP] criteria, including that he or she has a currently diagnosed mental disorder that renders the person dangerous."

---

[2] McKee does not contend that the amended Act was not intended to apply to someone in his situation, who was committed as an SVP after the passage of Proposition 83. This is therefore not a case in which Proposition 83 is being imposed retroactively. (See *People v. Litmon* (2008) 162 Cal.App.4th 383, 411–412 [76 Cal.Rptr.3d 122] [concluding Prop. 83 does not retroactively apply to indefinitely extend the two-year commitment of an SVP imposed prior to the Act's amendment].)

[3] All statutory references are to the Welfare and Institutions Code unless otherwise specified.

[4] Former section 6604 provided in pertinent part: "[T]he person shall not be kept in actual custody longer than two years unless a subsequent extended commitment is obtained from the court incident to the filing of a new petition for commitment under this article or unless the term of commitment changes pursuant to subdivision (e) of Section 6605."

As originally enacted, an SVP was defined as "a person who has been convicted of a sexually violent offense against two or more victims for which he or she received a determinate sentence and who has a diagnosed mental disorder that makes the person a danger to the health and safety of others in that it is likely that he or she will engage in sexually violent criminal behavior." (Former § 6600, subd. (a).) A "sexually violent offense" included a Penal Code section 288 lewd act on a child under age 14. (Former § 6600, subd. (b); *Hubbart, supra,* 19 Cal.4th at p. 1145.) Under the Act, a person is "likely" to engage in sexually violent criminal behavior (i.e., reoffend) if he or she "presents a substantial danger, that is, a serious and well-founded risk, that he or she will commit such crimes if free in the community." (*People v. Superior Court (Ghilotti)* (2002) 27 Cal.4th 888, 922 [119 Cal.Rptr.2d 1, 44 P.3d 949], italics omitted.)

The Act was "designed to ensure that the committed person does not 'remain confined any longer than he suffers from a mental abnormality rendering him unable to control his dangerousness.' [Citation.]" (*Hubbart, supra,* 19 Cal.4th at p. 1177.) The Act therefore provides "two ways a defendant can obtain review of his or her current mental condition to determine if civil confinement is still necessary. [First,] [s]ection 6608 permits a defendant to petition for *conditional* release to a community treatment program. . . . [Second,] [s]ection 6605 [requires] an annual review of a defendant's mental status that may lead to *unconditional* release." (*People v. Cheek* (2001) 25 Cal.4th 894, 898 [108 Cal.Rptr.2d 181, 24 P.3d 1204], fn. omitted.)

On November 7, 2006, California voters passed Proposition 83, entitled "The Sexual Predator Punishment and Control Act: Jessica's Law" amending the Act effective November 8, 2006. Proposition 83 is a wide-ranging initiative that seeks to address the problems posed by sex offenders. It increases penalties for sex offenses, both by altering the definition of some sex offenses and by providing longer penalties for some offenses as well as modifying probation and parole provisions: it requires a GPS tracking device for felons subject to such registration for the remainder of their lives; it prohibits a registered sex offender from living within 2,000 feet of schools and parks; and it changes the SVP Act by reducing the number of sexually violent offenses that qualify an offender for SVP status from two to one. (See Voter Information Guide, Gen. Elec. (Nov. 7, 2006) analysis of Prop. 83 by Legis. Analyst, pp. 43–44.) Proposition 83 also changes an SVP commitment from a two-year term to an indefinite commitment. It is this latter provision with which this case is concerned and which will be described in more detail below.

█ Pursuant to Proposition 83, section 6604, which had prescribed a two-year term for SVP's, now provides in relevant part: "If the court or jury

determines that the person is a sexually violent predator, the person shall be committed for an *indeterminate* term to the custody of the [DMH] for appropriate treatment and confinement . . . ." (Italics added.) Proposition 83 did not change section 6604's requirement that a person's initial commitment as an SVP be proved at trial beyond a reasonable doubt. Under Proposition 83, section 6605 continues to require current examinations of a committed SVP at least once every year. (§ 6605, subd. (a).) However, Proposition 83 added new provisions to section 6605 regarding the DMH's obligations: Pursuant to section 6605, subdivision (a), the DMH now files an annual report in conjunction with its examination of SVP's that "shall include consideration of whether the committed person currently meets the definition of a sexually violent predator and whether conditional release to a less restrictive alternative or an unconditional release is in the best interest of the person and conditions can be imposed that would adequately protect the community." Subdivision (b) now provides that "[i]f the [DMH] determines that either: (1) the person's condition has so changed that the person no longer meets the definition of a sexually violent predator, or (2) conditional release to a less restrictive alternative is in the best interest of the person and conditions can be imposed that adequately protect the community, the director shall authorize the person to petition the court for conditional release to a less restrictive alternative or for an unconditional discharge." (§ 6605, subd. (b).) If the state opposes the director's petition, then, as under the pre-Proposition 83 statute, it must prove beyond a reasonable doubt that the person still meets the definition of an SVP.

In the event the DMH does *not* authorize the committed person to file a petition for release pursuant to section 6605, the person nevertheless may file, as was the case with the pre-Proposition 83 Act, a petition for conditional release for one year and subsequent unconditional discharge pursuant to section 6608. (§ 6608, subd. (a).) Section 6608, subdivision (i), which was also unamended by the Act, provides: "In any hearing authorized by this section, *the petitioner shall have the burden of proof by a preponderance of the evidence*." (Italics added.) After a trial court denies a section 6608 petition, "the person may not file a new application until one year has elapsed from the date of the denial." (§ 6608, subd. (h).)

█ In short, under Proposition 83, an individual SVP's commitment term is indeterminate, rather than for a two-year term as in the previous version of the Act. An SVP can only be released conditionally or unconditionally if the DMH authorizes a petition for release and the state does not oppose it or fails to prove beyond a reasonable doubt that the individual still meets the definition of an SVP, or if the individual, petitioning the court on his own, is able to bear the burden of proving by a preponderance of the evidence that he is no longer an SVP. In other words, the method of petitioning the court for release and proving fitness to be released, which under the former Act had

been the way an SVP could cut short his two-year commitment, now becomes the only means of being released from an indefinite commitment when the DMH does not support release.[5]

### III. Discussion

#### A. *Due Process Claim*

■ McKee contends his indefinite involuntary commitment as an SVP under the Act violates his federal constitutional right to due process of law. There is no question that civil commitment itself is constitutional so long as it is accompanied by the appropriate constitutional protections. "States have in certain narrow circumstances provided for the forcible civil detainment of people who are unable to control their behavior and who thereby pose a danger to the public health and safety. [Citations.] . . . It . . . cannot be said that the involuntary civil confinement of a limited subclass of dangerous persons is contrary to our understanding of ordered liberty." (*Kansas v. Hendricks* (1997) 521 U.S. 346, 357 [138 L.Ed.2d 501, 117 S.Ct. 2072] (*Hendricks*).) In order to properly justify a civil commitment, "[a] finding of dangerousness, standing alone, is ordinarily not a sufficient ground upon which to justify indefinite involuntary commitment. We have sustained civil commitment statutes when they have coupled proof of dangerousness with the proof of some additional factor, such as a 'mental illness' or 'mental abnormality.' [Citations.]" (*Id.* at p. 358.)

■ McKee contends that it is the fact that his commitment is now indefinite, and that it is his burden to show by a preponderance of the evidence that he is no longer an SVP, that violates his federal due process rights. In making this argument, he relies in large part on *Addington v. Texas* (1979) 441 U.S. 418 [60 L.Ed.2d 323, 99 S.Ct. 1804] (*Addington*). In *Addington*, the court held unconstitutional a civil involuntary commitment statute that authorized an indefinite commitment when the state proved by a preponderance of the evidence that the individual was mentally incompetent. (*Id.* at pp. 419–422.) As *Addington* explained: "The state has a legitimate

---

[5] Proposition 83's findings state: "The People find and declare each of the following: [¶] . . . [¶] (k) California is the only state, of the number of states that have enacted laws allowing involuntary civil commitments for persons identified as sexually violent predators, which does not provide for indeterminate commitments. California automatically allows for a jury trial every two years irrespective of whether there is any evidence to suggest or prove that the committed person is no longer a sexually violent predator. As such, this act allows California to protect the civil rights of those persons committed as a sexually violent predator while at the same time protect society and the system from unnecessary or frivolous jury trial actions where there is no competent evidence to suggest a change in the committed person." (Voter Information Guide, Gen. Elec. (Nov. 7, 2006) text of Prop. 83, § 2, p. 127; see Historical and Statutory Notes, 47C West's Ann. Pen. Code (2008 ed.) foll. § 209, pp. 52–53.)

interest under its *parens patriae* powers in providing care to its citizens who are unable because of emotional disorders to care for themselves; the state also has authority under its police power to protect the community from the dangerous tendencies of some who are mentally ill. Under the Texas Mental Health Code, however, the State has no interest in confining individuals involuntarily if they are not mentally ill or if they do not pose some danger to themselves or others." (*Addington, supra*, 441 U.S. at p. 426.) The *Addington* court assessed the risk of improperly subjecting an individual to civil commitment: "At one time or another every person exhibits some abnormal behavior which might be perceived by some as symptomatic of a mental or emotional disorder, but which is in fact within a range of conduct that is generally acceptable. Obviously, such behavior is no basis for compelled treatment and surely none for confinement. However, there is the possible risk that a factfinder might decide to commit an individual based solely on a few isolated instances of unusual conduct. Loss of liberty calls for a showing that the individual suffers from something more serious than is demonstrated by idiosyncratic behavior. Increasing the burden of proof is one way to impress the factfinder with the importance of the decision and thereby perhaps to reduce the chances that inappropriate commitments will be ordered. [¶] The individual should not be asked to share equally with society the risk of error when the possible injury to the individual is significantly greater than any possible harm to the state." (*Id.* at pp. 426–427.)

The *Addington* court therefore concluded that "the individual's interest in the outcome of a civil commitment proceeding is of such weight and gravity that due process requires the state to justify confinement by proof more substantial than a mere preponderance of the evidence." (*Addington, supra*, 441 U.S. at p. 427.) It held that due process required proof by clear and convincing evidence at the appellant's initial civil commitment hearing. (*Id.* at p. 433.)

McKee argues *Addington* requires the state to prove by at least clear and convincing evidence in not only the first commitment hearing but periodically at subsequent commitment hearings as well, and that therefore section 6608, subdivision (i) violates due process by imposing on the petitioner the burden of proving by a preponderance of the evidence that he is entitled to release. As explained below, the United States Supreme Court case law decided after *Addington* leads to the conclusion that the clear and convincing evidence standard does not apply to subsequent commitment proceedings for SVP's.

The primary case relied on by the People is *Jones v. United States* (1983) 463 U.S. 354 [77 L.Ed.2d 694, 103 S.Ct. 3043] (*Jones*). *Jones* considered a District of Columbia statute that governed civil commitment of those who had been adjudged not guilty by reason of insanity of criminal charges

(NGI's). Under that statutory scheme, a defendant was required to prove his affirmative defense of insanity by a preponderance of the evidence. (*Id.* at p. 356, fn. 1.) After his acquittal by reason of insanity, another statute provided for his immediate commitment, with a hearing required within 50 days to determine whether he was eligible for release. At the hearing, he had "the burden of proving by a preponderance of the evidence that he [was] no longer mentally ill or dangerous. [Citation.]" (*Id.* at p. 357.) If he did not meet that burden at the 50-day hearing, he was "entitled [by statute] to a judicial hearing every six months at which he may establish by a preponderance of the evidence that he is entitled to release. [Citation.]" (*Id.* at p. 358, fn. omitted.)

The court rejected a due process challenge to the statute. Congress had determined "that a criminal defendant found not guilty by reason of insanity in the District of Columbia should be committed indefinitely to a mental institution for treatment and the protection of society. [Citations.]" (*Jones, supra,* 463 U.S. at pp. 361–362.) An NGI determination "establishe[d] two facts: (i) the defendant committed an act that constitutes a criminal offense, and (ii) he committed the act because of mental illness." (*Id.* at p. 363.) *Jones* stated: "Congress has determined that these findings constitute an adequate basis for hospitalizing the acquittee as a dangerous and mentally ill person. [Citations.] We cannot say that it was unreasonable and therefore unconstitutional for Congress to make this determination. [¶] The fact that a person has been found, beyond a reasonable doubt, to have committed a criminal act certainly indicates dangerousness. [Citation.] Indeed, this concrete evidence [of commission of a criminal act] generally may be at least as persuasive as any predictions about dangerousness that might be made in a civil-commitment proceeding." (*Id.* at p. 364, fns. omitted.)

Distinguishing *Addington,* the court explained that in equating NGI commitment with the ordinary civil commitment at issue in *Addington,* "petitioner ignores important differences between the class of potential civil-commitment candidates and the class of insanity acquittees that justify differing standards of proof. The *Addington* Court expressed particular concern that members of the public could be confined on the basis of 'some abnormal behavior which might be perceived by some as symptomatic of a mental or emotional disorder, but which is in fact within a range of conduct that is generally acceptable.' [Citations.] . . . But since automatic commitment under [the District of Columbia's NGI commitment statute] follows only if the *acquittee himself* advances insanity as a defense and proves that his criminal act was a product of his mental illness, there is good reason for diminished concern as to the risk of error. More important, the proof that he committed a criminal act as a result of mental illness eliminates the risk that he is being committed for mere 'idiosyncratic behavior[.]' [Citation.]" (*Jones, supra,* 463 U.S. at p. 367, fns. omitted.) *Jones* therefore concluded that "concerns critical to our

decision in *Addington* are diminished or absent in the case of insanity acquittees. Accordingly, there is no reason for adopting the same standard of proof in both cases. . . . The preponderance of the evidence standard comports with due process for commitment of insanity acquittees." (*Jones*, *supra*, 463 U.S. at pp. 367–368.)

■ Although McKee was not found not guilty by reason of insanity, he has been found beyond a reasonable doubt in his initial commitment to meet the definition of an SVP. That finding is, for present constitutional purposes, the functional equivalent of the NGI acquittal in *Jones*. As in *Jones*, McKee has already been found not only to have previously committed the requisite criminal acts but was found beyond a reasonable doubt to have "a diagnosed mental disorder that makes the person a danger to the health and safety of others in that it is likely that he or she will engage in sexually violent criminal behavior." (§ 6600, subd. (a).) Therefore, as in *Jones*, the danger recognized in *Addington* "that members of the public could be confined on the basis of 'some abnormal behavior which might be perceived by some as symptomatic of a mental or emotional disorder, but which is in fact within a range of conduct that is generally acceptable' " or "for mere 'idiosyncratic behavior' " (*Jones*, *supra*, 463 U.S. at p. 367) is greatly diminished. Accordingly, as in *Jones*, the requirement that McKee, after his initial commitment, must prove by a preponderance of the evidence that he is no longer an SVP does not violate due process.

■ McKee seeks to distinguish *Jones*, arguing that in the latter case, an individual was entitled to a hearing every six months, whereas there is no such entitlement for the SVP after Proposition 83. In fact, section 6608, subdivision (h) permits an SVP to file a new petition for release as early as a year after the previous petition was denied. The statute does permit the court to deny a hearing if the petition is frivolous. Section 6608, subdivision (a) provides in pertinent part: "If a person has previously filed a petition for conditional release without the concurrence of the director and the court determined, either upon review of the petition or following a hearing, that the petition was frivolous or that the committed person's condition had not so changed that he or she would not be a danger to others in that it is not likely that he or she will engage in sexually violent criminal behavior if placed under supervision and treatment in the community, then the court shall deny the subsequent petition unless it contains facts upon which a court could find that the condition of the committed person had so changed that a hearing was warranted. Upon receipt of a first or subsequent petition from a committed person without the concurrence of the director, the court shall endeavor whenever possible to review the petition and determine if it is based upon frivolous grounds and, if so, shall deny the petition without a hearing."

McKee contends that the court's discretion to deny a petition without a hearing as frivolous denies due process. We disagree. A frivolous petition is one that "indisputably has no merit." (*In re Marriage of Flaherty* (1982) 31 Cal.3d 637, 650 [183 Cal.Rptr. 508, 646 P.2d 179] [defining frivolous appeals].) McKee cites no authority for the proposition that due process is violated by not granting such petitions a hearing. The fact that the statute gives the court the authority to deny such petitions does not, of itself, serve as an obstacle to the primary due process goal of ensuring that only those individuals who continue to meet SVP criteria will remain involuntarily committed.[6]

McKee further contends that his lack of access to mental health experts to challenge his continuing commitment violates due process. As he points out, although section 6605, subdivision (d) mandates the appointment of experts when the DMH authorizes an indigent inmate to petition for release, section 6608, subdivision (a) merely provides that petitioner has the right to counsel, with no mention of experts, when he petitions without the DMH's approval.

McKee is correct that expert testimony is critical in an SVP commitment proceeding, in which the primary issue is not, as in a criminal trial, whether the individual committed certain acts, but rather involves a prediction about the individual's future behavior. If the state involuntarily commits someone on the basis of expert opinion about future dangerousness, places the burden on that person to disprove future dangerousness, and then makes it difficult for him to access his own expert because of his indigence to challenge his continuing commitment, that schema would indeed raise a serious due process concern.

We do not believe, however, that the statute needs to be interpreted in this narrow manner. It is true that section 6608, subdivision (a), unlike section 6605, subdivision (d), does not explicitly provide for experts when an SVP petitions the court for release. But section 6605, subdivision (a) states that in conjunction with the DMH's examination of an SVP's mental condition, which must occur "at least once every year," an SVP who is indigent may request and the court may appoint "a qualified expert or professional person to examine him or her." Although section 6605, subdivision (a) does not explicitly provide for the appointment of the expert in conjunction with a section 6608 petition, such appointment may be reasonably inferred. As is clear from the context, the annual examination authorized by section 6605,

---

[6] Of course, nothing we say here precludes an individual from challenging an erroneous judicial determination that a petition is frivolous. (See *People v. Collins* (2003) 110 Cal.App.4th 340, 350 [1 Cal.Rptr.3d 641] ["if the defendant's position has some merit on the issue of whether he or she may qualify for conditional release, the statute requires that the court provide the defendant a hearing on the matter"].)

subdivision (a), occurs not solely or even primarily for the purpose of assessing the SVP's treatment needs, but mainly for determining whether involuntary commitment is still required, or whether the SVP has sufficiently changed as a result of treatment to be released. There is no indication that the Legislature that authorized these expert appointments on behalf of an indigent SVP believed that such experts should be disallowed from testifying at an SVP's section 6608 hearing, nor that an SVP's indigence should serve as an obstacle to such testimony. On the contrary, the statute appears to encourage state-funded qualified expert appointed for a petitioner's benefit so as to ensure that the commitment lasts no longer than is necessary.

■ We construe statutes when reasonable to avoid difficult constitutional issues. (See *In re Smith* (2008) 42 Cal.4th 1251, 1269 [73 Cal.Rptr.3d 469, 178 P.3d 446].) ■ After Proposition 83, it is still the case that an individual may not be held in civil commitment when he or she no longer meets the requisites of such commitment. An SVP may be held, as the United States Supreme Court stated under similar circumstances, "as long as he is both mentally ill and dangerous, but no longer." (*Foucha v. Louisiana* (1992) 504 U.S. 71, 77 [118 L.Ed.2d 437, 112 S.Ct. 1780].) Given that the denial of access to expert opinion when an indigent individual petitions on his or her own to be released may pose a significant obstacle to ensuring that only those meeting SVP commitment criteria remain committed, we construe section 6608, subdivision (a), read in conjunction with section 6605, subdivision (a), to mandate appointment of an expert for an indigent SVP who petitions the court for release.

Construing the amended Act in the above manner, we conclude it does not violate the due process clause.

### B. *Ex Post Facto Claim*

McKee also contends his indefinite commitment under the terms of Proposition 83 violated the federal constitutional prohibition against ex post facto laws because it is punitive and was applied to his conduct prior to its enactment. We disagree.

■ Article I, section 10 of the United States Constitution provides: "No state shall . . . pass any . . . ex post facto law . . . ." The ex post facto clause prohibits only those laws that "retroactively alter the definition of crimes or increase the punishment for criminal acts." (*Collins v. Youngblood* (1990) 497 U.S. 37, 43 [111 L.Ed.2d 30, 110 S.Ct. 2715].)

■ In *Hubbart, supra,* 19 Cal.4th 1138, we made clear, in considering an ex post facto challenge to the pre-Proposition 83 version of the Act, that

the Legislature had "disavowed any 'punitive purpose[],' and declared its intent to establish 'civil commitment' proceedings in order to provide 'treatment' to mentally disordered individuals who cannot control sexually violent criminal behavior. [Citations.] The Legislature also made clear that, despite their criminal record, persons eligible for commitment and treatment as SVP's are to be viewed 'not as criminals, but as sick persons.' [Citation.] Consistent with these remarks, the [Act] was placed in the Welfare and Institutions Code, surrounded on each side by other schemes concerned with the care and treatment of various mentally ill and disabled groups." (*Hubbart*, at p. 1171.)

In concluding that our Act is not punitive, and therefore not within the scope of the ex post facto clause, we relied on the United States Supreme Court's similar conclusion in *Hendricks* with respect to Kansas's Sexually Violent Predator Act. As the court stated: "Far from any punitive objective, the confinement's duration is instead linked to the stated purposes of the commitment, namely, to hold the person until his mental abnormality no longer causes him to be a threat to others. [Citation.] If, at any time, the confined person is adjudged 'safe to be at large,' he is statutorily entitled to immediate release. [Citation.]" (*Hendricks, supra*, 521 U.S. at pp. 363–364.)

We therefore concluded the Act was not punitive because "[v]iewed as a whole, the SVPA is also designed to ensure that the committed person does not 'remain confined any longer than he suffers from a mental abnormality rendering him unable to control his dangerousness.' " (*Hubbart, supra*, 19 Cal.4th at p. 1177, quoting *Hendricks, supra*, 521 U.S. at p. 364.) It is true that, in elaborating on this statement, we pointed to the fact that "each period of commitment is strictly limited and cannot be extended unless the state files a new petition and again proves, beyond a reasonable doubt, that the person is dangerous and mentally impaired. (§ 6604.)" (*Hubbart, supra*, 19 Cal.4th at p. 1177.) But nothing in *Hubbart* suggests that these requirements are indispensable to shielding the Act from an ex post facto challenge. In fact, the nonpunitive objectives of the Act—treatment for the individual committed and protection of the public—remain the same after Proposition 83. Moreover, under the Act after Proposition 83, as before, a person is committed only for as long as he meets the SVP criteria of mental abnormality and dangerousness. As such, the Proposition 83 amendments at issue here cannot be regarded to have changed the essentially nonpunitive purpose of the Act.

McKee also argues that Proposition 83, taken as a whole, including increased provisions regarding the punishment for those convicted of sexually related offenses, evinces a punitive purpose. Obviously, the portion of Proposition 83 that concerns increased punishment for sex offenses is punitive. But the fact that the amendments to the civil commitment statute are part

of the same legislative enactment as amendments to the Penal Code does not render the former amendments punitive.

■ McKee also argues the seven-factor test articulated in *Kennedy v. Mendoza-Martinez* (1963) 372 U.S. 144, 168–169 [9 L.Ed.2d 644, 83 S.Ct. 554], applies to invalidate the Proposition 83 amendments at issue here. As the United States Supreme Court has explained, the *Mendoza-Martinez* factors provide "a useful framework. These factors, which migrated into our *ex post facto* case law from double jeopardy jurisprudence, have their earlier origins in cases under the Sixth and Eighth Amendments, as well as the Bill of Attainder and the *Ex Post Facto* Clauses. [Citation.] Because the *Mendoza-Martinez* factors are designed to apply in various constitutional contexts, we have said they are 'neither exhaustive nor dispositive' [citations], but are 'useful guideposts' [citation]. The factors most relevant to our analysis are whether, in its necessary operation, the regulatory scheme: has been regarded in our history and traditions as a punishment; imposes an affirmative disability or restraint; promotes the traditional aims of punishment; has a rational connection to a nonpunitive purpose; or is excessive with respect to this purpose." (*Smith v. Doe* (2003) 538 U.S. 84, 97 [155 L.Ed.2d 164, 123 S.Ct. 1140].)[7]

■ Although one of the five factors—affirmative restraints on liberty—is present here, as it is with all involuntary civil commitments, the other four factors go against McKee: (1) civil commitment has historically been imposed nonpunitively on those whose inability to control their behavior poses a danger to the public (see *Hendricks, supra,* 521 U.S. at p. 357); (2) as discussed above, the amendments to the SVP Act under consideration here do not alter the Act's nonpunitive purpose of treatment and public protection; (3) the civil commitment has a rational connection with those purposes; and (4) even with indefinite commitment and alterations in the burden and standard of proof, the commitment authorized by the Act is not excessive and is designed to last only as long as that person meets the definition of an SVP. We therefore conclude that the Proposition 83 amendments do not make the Act punitive and accordingly do not violate the ex post facto clause.

---

[7] The *Smith v. Doe* court, which addressed whether the imposition of a registration requirement for sex offenders fell within the scope of the ex post facto clause, explained that "[t]he two remaining *Mendoza-Martinez* factors—whether the regulation comes into play only on a finding of scienter and whether the behavior to which it applies is already a crime—are of little weight in this case. The regulatory scheme applies only to past conduct, which was, and is, a crime. This is a necessary beginning point, for recidivism is the statutory concern. The obligations the statute imposes are the responsibility of registration, a duty not predicated upon some present or repeated violation." (*Smith v. Doe, supra,* 538 U.S. at p. 105.) In the case of the SVP Act at issue here, although the trigger for eligibility is a certain type of past criminal conduct, the commitment cannot be effectuated without a determination of a current mental disorder and future dangerousness. The above two *Mendoza-Martinez* factors therefore do not count in McKee's favor.

## C. *Equal Protection Clause*

McKee contends his involuntary commitment as an SVP under the Act, as amended by Proposition 83 in 2006, violated his federal constitutional right to equal protection under the law because it treats SVP's significantly less favorably than those similarly situated individuals civilly committed under other statutes. We conclude his claim has some merit and will require remand for further proceedings.

*In re Moye, supra,* 22 Cal.3d 457 (*Moye*) is highly relevant to assessing McKee's claim and will be discussed at length. *Moye* followed *In re Franklin* (1972) 7 Cal.3d 126 [101 Cal.Rptr. 553, 496 P.2d 465], in which the court held that a person who has been found not guilty by reason of insanity can be civilly committed for at least the maximum term of the underlying offense, and may only be released from commitment during that term if he proves by a preponderance of the evidence that he is no longer a danger to the health and safety of himself or others. (*Id.* at p. 148.) As *Moye* summarized, we explained in *Franklin* "that by reason of the prior judicial determination of insanity, 'persons acquitted by reason of insanity fall within a special class, thereby providing a rational basis for differences in the treatment afforded them. . . . [¶] . . . "The special interest which the public has acquired in the confinement and release of people in this exceptional class results from the fact that there has been a judicial determination that they have already endangered the public safety and their own as a result of their mental conditions as distinguished from people civilly committed because of only potential danger." ' " (*Moye, supra,* at pp. 462–463.) The question presented in *Moye*, however, was whether the commitment can continue under the same rules after that maximum term, requiring an individual to prove by a preponderance of evidence that he was no longer in need of such commitment. (*Moye, supra,* 22 Cal.3d at p. 460.)

This court concluded that such extension of the commitment would violate equal protection. The court compared NGI commitment to commitment under the former Mentally Disordered Sex Offender (MDSO) Act, the forerunner of the SVP Act, although unlike SVP's, those committed under the MDSO Act were civilly committed in lieu of a prison term, rather than after that term. As we observed: MDSO's "comprise a class of individuals quite similar to those, such as petitioner, who have been acquitted of a criminal offense by reason of insanity. Both classes, for example, involve persons who initially have been found to have committed a criminal act, but whose mental condition warrants a period of confinement for treatment in a state institution, in lieu of criminal punishment." (*Moye, supra,* 22 Cal.3d at p. 463.) Although MDSO's had been initially subject to indefinite commitment, our own decisions cast doubt on the validity of such commitments and "the Legislature has subsequently

enacted new provisions which limit the duration of *all* MDSO commitments . . . [to] the 'longest term of imprisonment which could have been imposed for the offense or offenses of which the defendant was convicted . . . .' " (*Id.* at p. 464.) The Legislature then added former section 6316.2, which provided "for a special extended commitment of one year beyond the maximum term of imprisonment following jury trial if it is found that the patient suffers from a mental disorder and, as a result thereof, 'is predisposed to the commission of sexual offenses to such a degree that he presents a serious threat of substantial harm to the health and safety of others.' (§ 6316.2, subd. (a)(2).) Additional one-year commitments were available, following similar annual hearings. (*Id.*, subd. (h).)" (*Moye, supra,* 22 Cal.3d at p. 464.) The burden of proof in these hearings was on the People to prove the individual suffered from a mental disorder that predisposed him to commit sexual offenses that represented danger to the public. (*Ibid.*)

Thus, comparing the NGI and MDSO statutory schemes, we stated: "The foregoing provisions demonstrate the marked differences between the statutory commitment and release procedures applicable to MDSOs on the one hand and persons committed under section 1026 on the other. Yet, as we have noted the preconditions to both commitments are similar: the initial commitment follows commission of a criminal act and is based upon a finding of a mental disorder which might present a danger to others. The MDSO can be confined for only a limited period, measured by the maximum term for the underlying offense, unless thereafter the *People* (or other committing authority) can establish grounds for an extended commitment. In contrast, persons in petitioner's class face indefinite, lifetime confinement unless *they* can prove that their sanity has been restored." (*Moye, supra,* 22 Cal.3d at pp. 464–465.)

The *Moye* court then reviewed other California civil commitment statutes, including the Lanterman-Petris-Short Act (LPS Act; § 5000 et seq.), commitment for juvenile offenders, and for those deemed incompetent to stand trial, each of which had rules for recommitment similar to the MDSO Act. The court concluded: "In summary, our research reveals that commitments under section 1026 represent the *sole* instance of a potential lifetime confinement, imposed without regard to the nature of the underlying offense or the maximum punishment prescribed for it, and without the additional protection of periodic review and recommitment hearings. Thus, disparity of treatment seems clearly to exist." (*Moye, supra,* 22 Cal.3d at p. 465.)

The court then reasoned: "Because petitioner's personal liberty is at stake, the People concede that the applicable standard for measuring the validity of the statutory scheme now before us requires application of the strict scrutiny standard of equal protection analysis. Accordingly, the state must establish

both that it has a 'compelling interest' which justifies the challenged procedure and that the distinctions drawn by the procedure are necessary to further that interest. [Citation.] At the very least, persons similarly situated must receive like treatment under the law. [Citation.] As we have noted, by reason of their commission of a prior criminal act and the finding of a mental disorder justifying the initial commitment, persons committed as MDSOs are 'similarly situated' with persons like petitioner." (*Moye, supra,* 22 Cal.3d at pp. 465–466.)

The court then rejected the People's attempts to justify the differences in treatment between NGI and MDSO commitments. "The People suggest that MDSOs suffer from a more 'limited' form of mental disorder (predisposition toward commission of *sexual* offenses) when compared with persons found to be insane under [Penal Code] section 1026. It seems quite clear, however, that both classes of persons present equally substantial risks of harm. By statutory definition, an MDSO is a person 'who by reason of mental defect, disease, or disorder, is predisposed to the commission of sexual offenses *to such a degree that he is dangerous* to the health and safety of others.' (Welf. & Inst. Code, § 6300, italics added.) Yet, despite their potential dangerousness, MDSOs must be released from confinement when the maximum term for their underlying offense has expired, unless the People can establish grounds for an extended commitment. (*Id.,* § 6316.2.) We believe that constitutional demands of equal protection require a similar shifting of the burden of proof in favor of persons acquitted as insane, in order to retain them in confinement beyond the maximum term prescribed for the offense they committed while insane." (*Moye, supra,* 22 Cal.3d at p. 466.)

The court then concluded: "Specifically, we hold that principles of equal protection require . . . that persons committed to a state institution following acquittal of a criminal offense on the ground of their insanity cannot be retained in institutional confinement beyond the maximum term of punishment for the underlying offense of which, but for their insanity, they would have been convicted." (*Moye, supra,* 22 Cal.3d at p. 467.) The court further concluded that "[t]o the extent practicable, and in the absence of further legislation on the subject, the procedure for the extended commitment of persons committed [under the NGI statute] should conform to the procedures specified in section 6316.2 of the Welfare and Institutions Code." (*Ibid.*) Although the court did not mention it, section 6316.2, subdivision (e) then provided that MDSO's "shall be entitled to the rights guaranteed under the Federal and State Constitutions for criminal proceedings," which includes imposing on the People the burden of proving beyond a reasonable doubt that the individual continues to meet the definition of an MDSO. (Stats. 1977, ch. 164, § 3, pp. 634–635; see *In re Winship* (1970) 397 U.S. 358, 364 [25 L.Ed.2d 368, 90 S.Ct. 1068] [proof beyond a reasonable doubt constitutionally required for criminal trials]; see also *People v. Burnick* (1975) 14

Cal.3d 306, 332 [121 Cal.Rptr. 488, 535 P.2d 352] [proof beyond a reasonable doubt required for MDSO's].)

 Decisions by this court and the United States Supreme Court before and since *Moye* have used the equal protection clause to police civil commitment statutes to ensure that a particular group of civil committees is not unfairly or arbitrarily subjected to greater burdens. (See *Baxstrom v. Herold* (1966) 383 U.S. 107 [15 L.Ed.2d 620, 86 S.Ct 760] [when the state seeks to civilly commit a person after expiration of prison term, equal protection is violated when it does not afford a jury trial as for other civil committees]; *Jackson v. Indiana* (1972) 406 U.S. 715 [32 L.Ed.2d 435, 92 S.Ct. 1845] [the state may not indefinitely commit an individual deemed incompetent to stand trial, denying procedural protections afforded other civil committees]; *Humphrey v. Cady* (1972) 405 U.S. 504, 509 [31 L.Ed.2d 394, 92 S.Ct. 1048] [habeas corpus petitioner stated prima facie case that Wisconsin statute that civilly committed sex offenders violated equal protection by not providing jury trial available under the general civil commitment statute]; *Foucha v. Louisiana, supra,* 504 U.S. at pp. 84–85 [subjecting someone no longer insane to special civil commitment regime for insanity acquittees rather than to the general civil commitment statute violates equal protection]; *In re Gary W.* (1971) 5 Cal.3d 296, 307–308 [96 Cal.Rptr. 1, 486 P.2d 1201] [those committed by the former Youth Authority and subsequently civilly committed when they reach the age of 21 must pursuant to the equal protection clause be granted a jury trial afforded others civilly committed]; *Conservatorship of Hofferber* (1980) 28 Cal.3d 161, 178–179 [167 Cal.Rptr. 854, 616 P.2d 836] (*Hofferber*) [equal protection requires the determination that a conservatorship under the LPS Act for an individual initially determined to be incompetent to stand trial be made by a jury beyond a reasonable doubt when it is claimed the individual has a dangerous mental disorder].)

 Most recently in *In re Smith, supra,* 42 Cal.4th 1251 (*Smith*), we concluded that a substantial equal protection issue was raised when a person imprisoned for a conviction overturned on appeal was treated as an SVP rather than forcing the state to meet the more stringent civil commitment requirements of the LPS Act. We therefore interpreted an ambiguous section of the SVP Act providing that SVP petitions are not to be dismissed because of " 'good faith mistake of fact or law' " as not applying to such a person in order to avoid the equal protection issue. (42 Cal.4th at p. 1255.) In arriving at our conclusion, we summarized the relevant principles for applying equal protection analysis to civil commitment statutes: "(1) generally speaking, no individual or group when being civilly committed may be denied substantive or procedural protections that are provided to the population as a whole; (2) on the other hand, the Legislature may make reasonable distinctions between its civil commitment statutes based on a showing that the persons

are not similarly situated, meaning that those who are reasonably determined to represent a greater danger may be treated differently from the general population; (3) in particular, those who are criminally convicted, and those indicted of criminal charges but incompetent to stand trial, may be distinguished, at least initially, from the general population for civil commitment purposes, because their criminal acts demonstrate that they potentially pose a greater danger to society than those not in the criminal justice system." (*Id.* at pp. 1266–1267.)

Our statement of these principles in *Smith* followed an extensive discussion of *Hofferber*. In *Hofferber*, we found that those charged with criminal acts determined to be incompetent to stand trial could be subject to civil commitment under the LPS Act even though the state was not initially required to prove such persons were "gravely disabled" (§ 5008, subd. (h)(1)(A)) within the meaning of that act. (*Hofferber, supra,* 28 Cal.3d at pp. 170–174.) "[The state] may adopt more than one procedure for isolating, treating, and restraining dangerous persons; and differences will be upheld if justified. [Citations.] Variation of the length and conditions of confinement, *depending on degrees of danger reasonably perceived* as to special classes of persons, is a valid exercise of state power." (*Id.* at p. 172, italics added.) For this reason, we concluded, "some separate treatment of permanently incompetent criminal defendants formally charged with violent felonies is justified. Allegedly they have engaged in violence so critical that serious criminal charges were believed appropriate. Magistrates or grand juries have found substantial evidence that the alleged conduct actually was committed as alleged. Those determinations of probable cause establish strong grounds to believe that, by concrete acts, the incompetent defendants already have seriously imperiled public safety and thus are particularly dangerous." (*Id.* at p. 173.)

 In *Smith,* we concluded that the reasonably perceived greater danger of SVP's justifies their being treated differently from those subject to the LPS Act, the general civil commitment statute, who cannot be subject to long-term commitment based on psychiatric opinion alone. "Individuals in prison with felony convictions have yet to demonstrate their capacity or willingness to keep their conduct within the bounds of the law and to break old criminal habits, and the Legislature could legitimately conclude that such felons who have prior sexually violent offenses represent a particular danger to society that justifies a separate system of civil commitment." (*Smith, supra,* 42 Cal.4th at p. 1268.) It is reasonable to suppose that those who have been adjudicated to have committed criminal acts represent a class that is on the whole more dangerous than those who have not—in other words, that such adjudication is a reasonable proxy for greater dangerousness.

With these principles in mind, we turn to McKee's equal protection claim. He contends that SVP's are treated less favorably than those similarly

situated under the Mentally Disordered Offender (MDO) Act, Penal Code section 2960 et seq., in violation of the equal protection clause. To evaluate this claim, we briefly review the MDO Act.

"As a condition of parole, a prisoner may be designated and civilly committed as an MDO for involuntary treatment of a 'severe mental disorder' if certain conditions are met. ([Pen. Code,] §§ 2962, 2966; [citations].) Section 2962 provides that a prisoner is subject to the MDO Act if: '(a) The prisoner has a severe mental disorder that is not in remission or cannot be kept in remission without treatment'; '(b) The severe mental disorder was one of the causes of or was an aggravating factor in the commission of a crime for which the prisoner was sentenced to prison'; '(c) The prisoner has been in treatment for the severe mental disorder for 90 days or more within the year prior to the prisoner's parole or release'; '(d)' a special team of mental health professional[s] evaluated the prisoner and concluded that criteria (a), (b) and (c) above have been met, and that due to the severe mental disorder, the prisoner 'represents a substantial danger of physical harm to others', '(e)' the prisoner received a determinate sentence for the crime referenced in subdivision (b), and the crime is one of the enumerated crimes in subdivision (e). (§ 2962, subds. (a)–(e).) If such are found to exist, the prisoner may request a de novo hearing before the Board of Parole Hearings. (§ 2966.) If the Board of Parole Hearings concludes that the criteria are met, the prisoner may request a jury trial in the superior court. (*Ibid.*) 'The standard of proof shall be beyond a reasonable doubt, and if the trial is by jury, the jury shall be unanimous in its verdict.' (§ 2966, subd. (b); [citation].)

"Before an MDO's current commitment period expires, the district attorney may petition to extend that commitment by one year. (§ 2970.) To do so, the medical director of the state hospital, the community program director, or the Director of Corrections first 'shall submit' to the district attorney a written evaluation of the prisoner '[n]ot later than 180 days' before the prisoner's termination of parole or release. . . .' " (*People v. Allen* (2007) 42 Cal.4th 91, 99 [64 Cal.Rptr.3d 124, 164 P.3d 557], fn. omitted.) An MDO's commitment may be extended by one year if it is once again established beyond a reasonable doubt by a unanimous jury verdict that the individual meets the definition of an MDO. (Pen. Code, § 2972, subds. (a) & (c).)

As stated above, a prisoner is only eligible for MDO commitment if he or she has committed certain crimes of violence. These crimes are set forth in Penal Code section 2962, subdivision (e) and include voluntary manslaughter, kidnapping, carjacking, rape, forcible sodomy, armed robbery, arson, attempted murder, and other crimes in which the prisoner used force or violence or caused serious bodily injury.

 In summary, SVP's under the amended Act are given indeterminate commitments and thereafter have the burden to prove they should be released (unless the DMH authorizes a petition for release). In contrast, an MDO is committed for a one-year period and thereafter has the right to be released unless the People prove beyond a reasonable doubt that he or she should be recommitted for another year. There is therefore no question that, after the initial commitment, an SVP is afforded different and less favorable procedural protections than an MDO.

 As we have stated: " 'The first prerequisite to a meritorious claim under the equal protection clause is a showing that the state has adopted a classification that affects two or more *similarly situated* groups in an unequal manner.' [Citations.] This initial inquiry is not whether persons are similarly situated for all purposes, but 'whether they are similarly situated for purposes of the law challenged.' " (*Cooley v. Superior Court, supra,* 29 Cal.4th at p. 253.) In other words, we ask at the threshold whether two classes that are different in some respects are sufficiently similar with respect to the laws in question to require the government to justify its differential treatment of these classes under those laws.

The Court of Appeal, in rejecting McKee's equal protection challenge, concluded that SVP's and MDO's are not similarly situated. "The classifications of an SVP and an MDO are different. An SVP is defined as 'a person who has been convicted of a sexually violent offense against one or more victims and who has a diagnosed mental disorder that makes the person a danger to the health and safety of others in that it is likely that he or she will engage in sexually violent criminal behavior.' (§ 6600, subd. (a)(1).) In contrast, an MDO is generally defined as a person with a severe mental disorder that cannot be kept in remission without treatment and that was a cause or factor in the commission of a felony offense and, because of that severe mental disorder, represents a substantial danger of physical harm to others. (Pen. Code, § 2962, subds. (a)–(e); *People v. Allen, supra,* 42 Cal.4th at p. 99.) Therefore, the dangers posed by an SVP and an MDO are different. An SVP is civilly committed for treatment and confinement, in part, because of the danger posed that he or she will likely engage in sexually violent criminal behavior in the future. An MDO is civilly committed for treatment and confinement, in part, because of a substantial danger he or she will physically harm others in the future. Although both SVP's and MDO's have mental disorders, the dangers they pose (which provide the bases for their respective civil commitments) are different and therefore they are not similarly situated."

All that the above passage demonstrates is the incontrovertible point that SVP's and MDO's do not share identical characteristics. But the identification of the above differences does not explain why one class should bear a substantially greater burden in obtaining release from commitment than the other.

■ We conclude that MDO's and SVP's are similarly situated for our present purposes. As was stated in *In re Calhoun* (2004) 121 Cal.App.4th 1315 [18 Cal.Rptr.3d 315], in which the court struck down a policy that granted to SVP's a more restricted right to refuse antipsychotic medication than MDO's, both MDO's and SVP's "have been found, beyond a reasonable doubt, to suffer from mental disorders that render them dangerous to others. The dangerous finding requires only an assessment of future dangerousness. It does not require proof of a recent overt act. Both have been convicted of a serious or violent felony. At the end of their prison terms, both have been civilly committed to the Department of Mental Health for treatment of their disorders. Furthermore, the purpose of the MDO Act and the SVPA is the same: to protect the public from dangerous felony offenders with mental disorders and to provide mental health treatment for their disorders." (*Id.* at pp. 1351–1352; accord, *People v. Buffington* (1999) 74 Cal.App.4th 1149, 1156 [88 Cal.Rptr.2d 696] (*Buffington*) [concluding that SVP's and MDO's are similarly situated because "they are currently suffering from a mental disorder that renders them dangerous"]; *People v. Gibson* (1988) 204 Cal.App.3d 1425, 1436 [252 Cal.Rptr. 56] [an MDO is similarly situated to other adult persons involuntarily committed because "[o]ne purpose of all of these pertinent involuntary commitment schemes is the protection of the public from the dangerous mentally ill and their involuntary commitment for treatment"].) We agree that these common features make SVP's and MDO's similarly situated. Therefore, when the state makes the terms of commitment or recommitment substantially less favorable for one group than the other, the case law reviewed above teaches that it is required to give some justification for this differential treatment.

■ In other terms, imposing on one group an indefinite commitment and the burden of proving they should not be committed, when the other group is subject to short-term commitment renewable only if the People prove periodically that continuing commitment is justified beyond a reasonable doubt, raises a substantial equal protection question that calls for some justification by the People. As the United States Supreme Court has made clear, standards and burdens of proof represent societal determinations of who should bear the risk that a court's or jury's judgment will be in error. (*Addington, supra,* 441 U.S. at pp. 426–427.) Standards and burdens of proof, like other due process protections afforded both criminal defendants and persons subject to involuntary commitment, also balance the individual's fundamental liberty interest in not being incarcerated or involuntarily confined with the state's

compelling interest in protecting society from dangerous persons, in punishing criminal behavior in the case of criminal defendants, and in treating mental illness in the case of civil committees. Because MDO's and SVP's have the same interest at stake—the loss of liberty through involuntary civil commitment—it must be the case that when society varies the standard and burden of proof for SVP's in the manner in which Proposition 83 did, it does so because of the belief that the risks involved with erroneously freeing SVP's from their commitment are significantly greater than the risks involved with freeing MDO's. (See *Moye, supra,* 22 Cal.3d at pp. 465–467.) A substantial question is raised about the basis for this belief.[8]

The People argue that the state has a wide latitude in classifying different types of civil commitments, citing *People v. Wilkinson* (2004) 33 Cal.4th 821, 838 [16 Cal.Rptr.3d 420, 94 P.3d 551], a criminal case. There is no question that the determination of punishment for various offenses inherently involves value and policy determinations left to the Legislature, or to the people acting in a legislative capacity, and penal classifications will be upheld unless they are irrational. (See *People v. Hofsheier* (2006) 37 Cal.4th 1185, 1201 [39 Cal.Rptr.3d 821, 129 P.3d 29].) But as discussed above, the MDO and SVP Acts are not penal statutes. The differentiation between MDO's and SVP's must be made with reference to the goals of the statutes, i.e. treatment of the mentally disordered or public protection. Therefore, as discussed above, the Legislature may make reasonable distinctions between its civil commitment statutes based on a showing "that those who are reasonably determined to represent a greater danger may be treated differently from the general population." (*Smith, supra,* 42 Cal.4th at p. 1266.) A prior adjudication of criminal conduct is a reasonable proxy for greater danger to the public and may therefore serve as a basis for treating civil committees subject to such an adjudication differently from the general class of individuals subject to civil commitment. (*Ibid.*; see also *Hofferber, supra,* 28 Cal.3d at pp. 171–173.) This differential treatment may result at least initially in imposing a greater burden of proof in order to be released from involuntary commitment. (*Moye, supra,* 22 Cal.3d at pp. 462–463.) Here, however, both SVP's and MDO's have suffered prior felony convictions, and both have been determined by mental health experts to suffer from mental disorders that

---

[8] The concurring and dissenting opinion argues that because there is some overlap between the SVP Act and the MDO Act, and because the former was enacted after the latter, it follows that "sexually violent predators are a *particularly dangerous* subset of the broader group of persons who may be civilly committed under the MDO Act." (Conc. & dis. opn. of Chin, J., *post,* at p. 1220, original italics.) But if the concurring and dissenting opinion means to suggest that SVP's are therefore more dangerous than persons committed under the MDO Act, that inference neither follows logically from the circumstances of overlap and later enactment, nor is it supported by authority or evidence. Indeed, that inference is contrary to the fact that originally the terms under which MDO's and SVP's were committed were substantially similar. (See *Buffington, supra,* 74 Cal.App.4th at pp. 1156–1162.)

make them a continuing danger. Therefore, the reasons for differential treatment are not immediately obvious from the face of the two statutory schemes.

The People also rely on a passage from *Buffington* that attempts to justify the fact that MDO's receive treatment while in prison while SVP's do not. As that court stated: "Prisoners who suffer from conditions that may with treatment be kept in remission are the target of the MDO Act, whereas the SVPA covers prisoners whose conditions pose a risk of future sexually violent criminal behavior and who may never be completely treated. (Pen. Code, § 2962; Welf. & Inst. Code, § 6606, subd. (b).) Given these contrasting backgrounds and expectations related to treatment, we cannot say the two groups are similarly situated in this respect for equal protection purposes." (*Buffington, supra,* 74 Cal.App.4th at p. 1163.) *People v. Hubbert* (2001) 88 Cal.App.4th 1202, 1222 [106 Cal.Rptr.2d 490], provides a somewhat more specific rendering of the above: "[T]he MDO law targets persons with severe mental disorders that may be kept in remission with treatment (Pen. Code, § 2962, subd. (a)), whereas the SVP [Act] targets persons with mental disorders that may never be successfully treated. (Welf. & Inst. Code, § 6606, subd. (b).)" The People then argue that "[g]iven these 'contrasting backgrounds and expectations related to treatment,' [SVP's and MDO's] are not similarly situated for purposes of how long they should be confined and treated."

The truth of this assertion is unclear from the face of the statutes in question. The two statutes cited in *Buffington* and *Hubbart* are Penal Code section 2962 and Welfare and Institutions Code section 6606, subdivision (b). Penal Code section 2962, subdivision (a) states, in pertinent part that a prisoner may be classified as an MDO if he "has a severe mental disorder that is not in remission *or* cannot be kept in remission without treatment." (Italics added.) Welfare and Institutions Code section 6606, subdivision (b) provides: "Amenability to treatment is not required for a finding that any person is a person described in Section 6600, nor is it required for treatment of that person. Treatment does not mean that the treatment be successful or potentially successful, nor does it mean that the person must recognize his or her problem and willingly participate in the treatment program."

In other words, Penal Code section 2962, subdivision (a) includes two classes of MDO's: those whose mental disorders are simply found to be not in remission, and those whose mental disorders are found to be in remission only due to treatment. While the statute therefore contemplates that the latter class of MDO's will need and respond to treatment, it also includes in the former class those whose illnesses are not in remission and do not necessarily respond to treatment. There is therefore little difference in this respect between MDO's and SVP's; section 6606, subdivision (b) envisions that some SVP's will, and some will not, respond to treatment.

It is true that unlike the SVP commitment, an MDO commitment initially arises as a condition of parole and is only extended beyond parole if the individual's mental disorder is found not to be in remission. (See Pen. Code, §§ 2962, 2970.) This circumstance may arguably evince a legislative expectation that those initially classified as MDO's as a condition of parole may be more amenable to treatment than persons subject to SVP commitment immediately following a prison sentence. But it is not evident that those who are committed as MDO's after their parole term has expired, who have not yet demonstrated an amenability to treatment and have been determined to pose a continuing danger as a result of a mental disorder, differ materially from SVP's in terms of danger to society and need for continuing commitment.

The Court of Appeal below, in concluding that SVP's are more of a danger than MDO's, relied upon the legislative findings to Proposition 83: "As the California Supreme Court noted, the Act, on its original enactment, 'narrowly target[ed] "a small but extremely dangerous group of sexually violent predators that have diagnosable mental disorders [who] can be identified while they are incarcerated." ' (*Cooley v. Superior Court, supra,* 29 Cal.4th at p. 253.) [¶] Thereafter, on passage of Proposition 83, the voters' information pamphlet for Proposition 83 noted: 'Sex offenders have very high recidivism rates. According to a 1998 report by the U.S. Department of Justice, sex offenders are the least likely to be cured and the most likely to reoffend, and they prey on the most innocent members of our society. More than two-thirds of the victims of rape and sexual assault are under the age of 18. Sex offenders have a dramatically higher recidivism rate for their crimes than any other type of violent felon.' (See Voters Information Guide, Gen. Elec. (Nov. 7, 2006) text of Prop. 83, p. 127; Historical and Stat. Notes, 47C West's Ann. Pen. Code (2008) foll. § 209, p. 52.)"

But these assertions, written into the findings of Proposition 83 by those who drafted the initiative, are not the same as facts, and an allusion to an uncited United States Department of Justice study does not make them so.[9] When a constitutional right, such as the right to liberty from involuntary confinement, is at stake, the usual judicial deference to legislative findings gives way to an exercise of independent judgment of the facts to ascertain whether the legislative body " 'has drawn reasonable inferences based on substantial evidence.' " (*Professional Engineers v. Department of Transportation* (1997) 15 Cal.4th 543, 569 [63 Cal.Rptr.2d 467, 936 P.2d 473], quoting *Turner Broadcasting System, Inc. v. FCC* (1994) 512 U.S. 622,

[9] Our own research has been unable to locate a relevant *1998* United States Department of Justice study. We have uncovered a *1997* study of sex offenders by the United States Department of Justice, Bureau of Justice Statistics. (Greenfeld, Bur. of Justice Statistics, Sex Offenses and Offenders: An Analysis of Data on Rape and Sexual Assault (Feb. 1997).) It is unclear from an initial reading of the report whether it supports the factual assertions about recidivism made by the Proposition 83 legislative findings. (See also Langan & Levin, Bur. of Justice Statistics, Recidivism of Prisoners Released in 1994 (June 2002).)

666 [129 L.Ed.2d 497, 114 S.Ct. 2445] (lead opn. of Kennedy, J.); see also *Spiritual Psychic Science Church v. City of Azusa* (1985) 39 Cal.3d 501, 514 [217 Cal.Rptr. 225, 703 P.2d 1119].) Thus, for example, where a constitutional right to privacy is at issue, evidence introduced at trial may call into question legislative factfinding. (*American Academy of Pediatrics v. Lungren* (1997) 16 Cal.4th 307, 354–356 [66 Cal.Rptr.2d 210, 940 P.2d 797].) Therefore, the legislative findings recited in the ballot initiative do not by themselves justify the differential treatment of SVP's. Nor do these findings reference any comparisons between SVP's and MDO's.

 Nor is it a response to McKee's equal protection challenge that the SVP commitment statute does not violate the due process clause, as discussed above. Due process and equal protection protect different constitutional interests: due process affords individuals a baseline of substantive and procedural rights, whereas equal protection safeguards against the arbitrary denial of benefits to a certain defined class of individuals, even when the due process clause does not require that such benefits be offered. (See, e.g., *Califano v. Westcott* (1979) 443 U.S. 76 [61 L.Ed.2d 382, 99 S.Ct. 2655] [rule that welfare benefits may be granted to families with dependent children when the father becomes unemployed but not the mother violates equal protection].) Here, as in *Moye* and related cases, when certain due process protections for those civilly committed are guaranteed by statute, even if not constitutionally required, the denial of those protections to one group must be reasonably justified in order to pass muster under the equal protection clause.

 McKee argues that NGI's and SVP's are also similarly situated and that a comparison of the two commitment regimes raises similar equal protection problems as discussed above. His argument has merit. NGI's as discussed are those who have committed criminal acts but have been civilly committed rather than criminally penalized because of their severe mental disorder. Under the current statutory scheme they may not be in civil custody longer than the maximum state prison term to which they could have been sentenced for the underlying offense (Pen. Code, § 1026.5, subd. (a); *People v. Crosswhite* (2002) 101 Cal.App.4th 494 [124 Cal.Rptr.2d 301]) unless at the end of that period the district attorney extends the commitment for two years by proving in a jury trial beyond a reasonable doubt that the person presents a substantial danger of physical harm to others because of a mental disease, defect, or disorder. (Pen. Code, § 1026.5, subd. (b)(1); *People v. Haynie* (2004) 116 Cal.App.4th 1224, 1226 [11 Cal.Rptr.3d 163]; *People v. Superior Court (Blakely)* (1997) 60 Cal.App.4th 202, 216 [70 Cal.Rptr.2d 388].) We agree that, as with MDO's, the People have not yet carried their burden of justifying the differences between the SVP and NGI commitment statutes.

We do not conclude that the People could not meet its burden of showing the differential treatment of SVP's is justified. We merely conclude that it has not yet done so. Because neither the People nor the courts below properly

understood this burden, the People will have an opportunity to make the appropriate showing on remand. It must be shown that, notwithstanding the similarities between SVP's and MDO's, the former as a class bear a substantially greater risk to society, and that therefore imposing on them a greater burden before they can be released from commitment is needed to protect society. This can be shown in a variety of ways. For example, it may be demonstrated that the inherent nature of the SVP's mental disorder makes recidivism as a class significantly more likely. Or it may be that SVP's pose a greater risk to a particularly vulnerable class of victims, such as children. Of course, this latter justification would not apply to SVP's who have no history of victimizing children. But in the present case, McKee's previous victims were children.[10] Or the People may produce some other justification.

The concurring and dissenting opinion objects to any such remand, declaring that "[w]hether society should treat sex crimes and their perpetrators differently from those who commit other crimes, however, is a judgment call for society to make, not a 'fact' for a judge to determine after an evidentiary hearing." (Conc. & dis. opn. of Chin, J., *post*, at p. 1229.) In support of its position it cites a criminal case, *Powell v. Texas* (1968) 392 U.S. 514 [20 L.Ed.2d 1254, 88 S.Ct. 2145], in which the United States Supreme Court rejected a constitutional challenge to the criminalization of public intoxication. If we were considering a criminal statute and the legislative judgment about how to punish sex crimes, we would agree with the concurring and dissenting opinion. But as discussed above, the SVP Act is not a penal statute, and distinctions in the terms of civil commitment statutes that substantially disfavor a particular group are to be made "on the basis of degree of danger presented." (*Hofferber, supra,* 28 Cal.3d at p. 173.) Nor does the fact that we have recognized that SVP's are " 'extremely dangerous' " (*Cooley v. Superior Court, supra,* 29 Cal.4th at p. 253) resolve the equal protection claim before us, as the concurring and dissenting opinion appears to conclude. Here SVP's are being compared to other classes of persons subject to civil commitment who also are being committed because of the substantial danger they pose to society.

We therefore remand this case to the trial court to determine whether the People, applying the equal protection principles articulated in *Moye* and related cases discussed in the present opinion, can demonstrate the constitutional justification for imposing on SVP's a greater burden than is imposed

---

[10] It is not entirely clear why SVP's who target children are more dangerous to society than MDO's or NGI's whose victims were children. It may be the case that SVP's whose previous victims were children are more likely, because of the nature of their mental disorder, to target children in the future, whereas MDO's or NGI's who have committed violent acts against children are less likely to specifically target child victims if they reoffend. This argument was not made below, and we have no way of knowing whether it has a factual basis.

on MDO's and NGI's in order to obtain release from commitment.[11] The trial court may, if appropriate, permit expert testimony.[12]

[11] McKee also argues that equal protection is violated because he is treated differently from those committed under the LPS Act. The LPS Act (§ 5000 et seq.) is California's general civil commitment statute and applies to those mentally incompetent individuals who are gravely disabled and/or represent a danger to themselves and others. (See *Smith, supra*, 42 Cal.4th at pp. 1267–1268.) Although some committed under the LPS Act have been found incompetent to stand trial on criminal charges (see § 5008, subd. (h)), they have not been definitively determined to have committed serious felonies, and in that respect differ from SVP's, MDO's, and NGI's. As noted, "[i]ndividuals in prison with felony convictions have yet to demonstrate their capacity or willingness to keep their conduct within the bounds of the law and to break old criminal habits, and the Legislature could legitimately conclude that such felons who have prior sexually violent offenses represent a particular danger to society that justifies a separate system of civil commitment." (*Smith, supra*, 42 Cal.4th at p. 1268.) Because these SVP's, MDO's, and NGI's more closely resemble one another than they do those persons committed under the LPS Act, it is appropriate on remand to focus on these groups rather than on those persons committed under the LPS Act in assessing McKee's equal protection claim.

In this connection, we note that the concurring and dissenting opinion goes to considerable length to demonstrate a point no one contests, no matter what the standard of review being applied—that SVP's may be validly subject to a different statutory scheme than those subject to the general civil commitment statute. Indeed, the out-of-state cases that the concurring and dissenting opinion cites for the most part merely support this unremarkable proposition. (See *Martin v. Reinstein* (Ct.App. 1999) 195 Ariz. 293 [987 P.2d 779, 796]; *Westerheide v. State* (Fla. 2002) 831 So.2d 93, 111–112; *In re Detention of Samuelson* (2000) 189 Ill.2d 548 [244 Ill.Dec. 929, 727 N.E.2d 228, 236–237]; *In re Detention of Williams* (Iowa 2001) 628 N.W.2d 447, 453–454; *In re P.F.* (2008) 2008 ND 37 [744 N.W.2d 724, 731–732]; *In re Treatment and Care of Luckabaugh* (2002) 351 S.C. 122 [568 S.E.2d 338, 351]; *In re Commitment of Petersen* (2000) 104 Wn.App. 283 [36 P.3d 1053, 1057]; see also *Hendricks, supra*, 521 U.S. at p. 377 (dis. opn. of Breyer, J.).)

The two out-of-state cases cited by the concurring and dissenting opinion that are remotely on point are readily distinguishable. In *State v. Post* (1995) 197 Wis.2d 279 [541 N.W.2d 115], the Wisconsin Supreme Court considered an equal protection challenge to their SVP statute. Among the challenges considered was that the terms of release from commitment were different from parallel terms in the general civil commitment statute. (541 N.W.2d at p. 132.) In addition to the fact that the court considered a comparison only between the SVP statute and the general commitment statute, the SVP statute under consideration was substantially different from the statute at issue here. The Wisconsin statute provided that an SVP could "petition for supervised release every six months and must be released unless the state can show clear and convincing evidence that continued secure confinement is necessary." (541 N.W.2d at p. 132.)

In *In re Care and Treatment of Coffman* (Mo. 2007) 225 S.W.3d 439 (in bank), the petitioner challenged Missouri's SVP act on equal protection grounds because other persons involuntarily civilly committed were not required to prove by a preponderance of the evidence that the commitment should not continue. (225 S.W.3d at p. 445.) The court concluded that "[b]ecause the basis for commitment of sexually violent predators is different from *general civil commitments*, there is no requirement that sexually violent predators be afforded exactly the same rights as persons committed under the general civil standard." (*Ibid.*, italics added.) But the equal protection challenge at issue in this case arises not from a comparison between SVP's and those subject to a general civil commitment statute, but between SVP's and two other groups of highly dangerous civil committees—MDO's and NGI's—and the differences between these groups in terms of danger to the public is not readily apparent.

[12] We also note that Senate Bill No. 1128 (2005–2006 Reg. Sess.), enacted in September 2006 as an urgency measure, shortly before the passage of Proposition 83, anticipated the

In remanding the case, we make clear that different classes of individuals civilly committed need not be treated identically. In *Hofferber, supra*, 28 Cal.3d 161, even as we affirmed that fundamental distinctions between classes of individuals subject to civil commitment are subject to strict scrutiny (*id.* at p. 171, fn. 8), we also acknowledged the government's legitimate capacity to make reasonable distinctions: "The state has compelling interests in public safety and in humane treatment of the mentally disturbed. [Citation.] It may adopt more than one procedure for isolating, treating, and restraining dangerous persons; and differences will be upheld if justified. [Citations.] Variation of the length and conditions of confinement, depending on degrees of danger reasonably perceived as to special classes of persons, is a valid exercise of state power." (*Id.* at pp. 171–172, fn. omitted.) Moreover, we have recognized "the importance of deferring to the legislative branch in an area which is analytically nuanced and dependent upon medical science." (*Hubbart, supra*, 19 Cal.4th at p. 1156.) But the government has not yet shown that the special treatment of SVP's is validly based on the degree of danger reasonably perceived as to that group, nor whether it arises from any medical or scientific evidence. On remand, the government will have an opportunity to justify Proposition 83's indefinite commitment provisions, at least as applied to McKee, and demonstrate that they are based on a reasonable perception of the unique dangers that SVP's pose rather than a special stigma that SVP's may bear in the eyes of California's electorate.[13]

Moreover, we emphasize that mere disagreement among experts will not suffice to overturn the Proposition 83 amendments. The trial court must determine whether the legislative distinctions in classes of persons subject to civil commitment are reasonable and factually based—not whether they are

indefinite commitment term for SVP's that was later included in that proposition. (Stats. 2006, ch. 337, §§ 55, 57; see *Bourquez v. Superior Court* (2007) 156 Cal.App.4th 1275, 1280–1281 [68 Cal.Rptr.3d 142].) The People have not addressed whether the legislative history of that statute contains any justification for treating SVP's differently from MDO's and may do so on remand. Although the concurring and dissenting opinion makes much of the fact that the Legislature enacted reforms shortly before the passage of Proposition 83 similar to those considered here, it cites no factual findings in the legislative history that explain the distinction between SVP's and MDO's or NGI's.

We further note that the concurring and dissenting opinion's speculation that we are contemplating the use of "nonexpert testimony" on remand (conc. & dis. opn. of Chin, J., *post*, at p. 1229) is unwarranted.

[13] Moreover, we strongly disagree with the concurring and dissenting opinion's characterization of our view as being "that every detail of every civil commitment program is subject to strict scrutiny." (Conc. & dis. opn. of Chin, J., *post*, at p. 1218.) Nor do we agree with the concurring and dissenting opinion inasmuch as it means to imply that the change from a short-term commitment, renewable only if the state carries its burden beyond a reasonable doubt, to an indefinite commitment in which the person committed has the burden of proof is merely an alteration of a minor detail of the commitment scheme.

incontrovertible or uncontroversial. The trial court is to determine not whether the statute is wise, but whether it is constitutional.[14]

## IV. DISPOSITION

The judgment of the Court of Appeal is affirmed in part and reversed in part, and the cause is remanded with directions to remand to the trial court for proceedings consistent with this opinion.

George, C. J., Kennard, J., Werdegar, J., and Corrigan, J., concurred.

**CHIN, J.,** Concurring and Dissenting.—In 2006, the Legislature and then, in an identical fashion, the electorate, reformed provisions of California's Sexually Violent Predators Act (SVPA; Welf. & Inst. Code, § 6600 et seq.) concerning the procedures for releasing sexually violent predators from civil commitment and permitting them to rejoin society.[1] The issue before us is whether these reforms are constitutional.

The majority holds that the reforms do not violate defendant's ex post facto and due process rights. I agree. But, because the Legislature and electorate did not make similar changes to other civil commitment schemes, the majority also holds that an evidentiary hearing is needed to determine whether the changes violate equal protection principles. I disagree. Consistent with the unanimous view of all seven panels in five Courts of Appeal that have considered this precise question in originally published opinions, and of all the decisions in other states that have rejected this or similar equal protection contentions, I would find no equal protection violation. I would uphold the legislative and electoral reforms against all of the constitutional challenges of this case.

The equal protection question comes down to this: May society treat sexually violent predators—those who have committed and been convicted of *sex crimes*—differently from persons who did not commit sex crimes? To ask the question should be to answer it. As the United States Supreme Court and this court have recognized, sexually violent predators are different from other

---

[14] We also emphasize that our holding in the present case does not mean that statutes pertaining to sexual offenders in general must be subject to heightened scrutiny. The lifetime registration requirements imposed by Penal Code section 290, for example, do not involve the loss of liberty. (See *Smith v. Doe, supra*, 538 U.S. at p. 100.) Such regulatory statutes not involving affirmative disability or restraint, are subject to rational basis review, and the Legislature will be given wide latitude to decide who should be subject to registration requirements. (See *People v. Monroe* (1985) 168 Cal.App.3d 1205, 1215 [215 Cal.Rptr. 51].)

[1] The majority opinion briefly acknowledges the Legislature's action (maj. opn., *ante*, at p. 1209, fn. 12), but otherwise it discusses only what the electorate did and largely ignores the fact that the Legislature acted first.

criminals; they are "particularly" (*Kansas v. Hendricks* (1997) 521 U.S. 346, 364 [138 L.Ed.2d 501, 117 S.Ct. 2072] (*Hendricks*)) or " 'extremely' " (*Cooley v. Superior Court* (2002) 29 Cal.4th 228, 253 [127 Cal.Rptr.2d 177, 57 P.3d 654]) dangerous. We do not need an evidentiary hearing to conclude that they present a unique danger to society that warrants specific remedies.

A community may take action to protect its children and other vulnerable members from violent sex offenders, even if that action does not apply to persons subject to other civil commitment schemes. The Legislature or electorate may, without running afoul of equal protection principles, address one societal problem even if it does not simultaneously address other problems. Society has long treated sexual predators differently from others. Good reason exists for this different treatment. Sexual predators *are* different. And their sexually predatory conduct has a uniquely traumatizing effect on their victims. The Legislature or the electorate or, as here, both, may address the dangers that sexually violent predators pose separately from other societal problems, and craft remedies to protect society from their depravations that differ from remedies crafted for nonsex offenders.

## I. BACKGROUND

A historical review is necessary to place this issue fully into context.

"Historically, the states have exercised a power of involuntary civil commitment involving the care and treatment of dangerous mentally disordered individuals." (*Hubbart v. Superior Court* (1999) 19 Cal.4th 1138, 1143 [81 Cal.Rptr.2d 492, 969 P.2d 584] (*Hubbart*).) "In recent years, lawmakers across the country have perceived a link between certain diagnosable mental disorders and violent sexual behavior that is criminal in nature. Through passage of the SVPA, California is one of several states to hospitalize or otherwise attempt to treat troubled sexual predators apart from any criminal sanctions they might receive, and *apart from civil commitment schemes targeting other mental health problems. (Kansas v. Hendricks*[, *supra*,] 521 U.S. 346, 388–389 . . . (dis. opn. of Breyer, J.) [identifying 17 states with such statutes] (*Hendricks*).)" (*Hubbart, supra*, at p. 1143, italics added.)

One early statute dealing specifically with sexual predators is a Kansas law enacted in 1994 entitled, much like the California statute at issue here, the Sexually Violent Predator Act. (Kan. Stat. Ann. § 59-29a01 et seq.) In 1997, the United States Supreme Court considered—and rejected—a constitutional challenge (that did not include an equal protection challenge) to that law. (*Hendricks, supra*, 521 U.S. 346.) The high court explained that the "Kansas Legislature enacted the Sexually Violent Predator Act . . . in 1994 to grapple

with the problem of managing repeat sexual offenders. Although Kansas already had a statute addressing the involuntary commitment of those defined as 'mentally ill,' the legislature determined that *existing civil commitment procedures were inadequate to confront the risks presented by 'sexually violent predators.' "* (*Id.* at pp. 350–351, fn. omitted, italics added.)

The court quoted with approval the preamble to the Kansas law, where the Kansas Legislature explained that a " 'small but extremely dangerous group of sexually violent predators exist who do not have a mental disease or defect that renders them appropriate for involuntary treatment pursuant to the [general involuntary civil commitment statute] . . . . In contrast to persons appropriate for civil commitment under the [general involuntary commitment statute], sexually violent predators generally have anti-social personality features which are unamenable to existing mental illness treatment modalities and those features render them likely to engage in sexually violent behavior. The legislature further finds that sexually violent predators' likelihood of engaging in repeat acts of predatory sexual violence is high. *The existing involuntary commitment procedure . . . is inadequate to address the risk these sexually violent predators pose to society.* The legislature further finds that the prognosis for rehabilitating sexually violent predators in a prison setting is poor, the treatment needs of this population are very long term and the treatment modalities for this population are very different than the traditional treatment modalities for people appropriate for commitment under the [general involuntary civil commitment statute].' " (*Hendricks, supra,* 521 U.S. at p. 351, italics added.)

The Kansas statute defined a "sexually violent predator" as " 'any person who has been convicted of or charged with a sexually violent offense and who suffers from a mental abnormality or personality disorder which makes the person likely to engage in the predatory acts of sexual violence.' " (*Hendricks, supra,* 521 U.S. at p. 352.) Under that law, a person could be civilly committed as a sexually violent predator only after prescribed procedures were followed, including "a trial [that] would be held to determine beyond a reasonable doubt whether the individual was a sexually violent predator." (*Id.* at p. 353.) After that determination was made, "[c]onfined persons were afforded three different avenues of review: First, the committing court was obligated to conduct an annual review to determine whether continued detention was warranted. [Citation.] Second, the Secretary [of Social and Rehabilitation Services] was permitted, at any time, to decide that the confined individual's condition had so changed that release was appropriate, and could then authorize the person to petition for release. [Citation.] Finally, even without the Secretary's permission, the confined person could at any time file a release petition. [Citation.] If the court found that the State could no longer satisfy its burden under the initial commitment standard, the individual would be freed from confinement." (*Ibid.*)

In upholding the Kansas law, the high court found that "the Kansas Legislature has taken great care to confine only a narrow class of *particularly dangerous individuals* . . . ." (*Hendricks, supra*, 521 U.S. at p. 364, italics added.) It recognized "that psychiatric professionals are not in complete harmony in casting pedophilia, or paraphilias in general, as 'mental illnesses.' " (*Id.* at p. 360, fn. 3.) Reiterating what it had said in an earlier case, however, the court stated that "[t]hese disagreements . . . do not tie the State's hands in setting the bounds of its civil commitment laws. In fact, it is precisely where such disagreement exists that legislatures have been afforded the widest latitude in drafting such statutes." (*Ibid.*, citing *Jones v. United States* (1983) 463 U.S. 354, 365, fn. 13 [77 L.Ed.2d 694, 103 S.Ct. 3043].) The court added that "when a legislature 'undertakes to act in areas fraught with medical and scientific uncertainties, legislative options must be especially broad and courts should be cautious not to rewrite legislation.' " (*Hendricks, supra*, at p. 360, fn. 3, quoting *Jones v. United States, supra*, at p. 370.)

Justice Breyer, speaking for four members of the court, dissented in *Hendricks*, but only on the ex post facto point. (*Hendricks, supra*, 521 U.S. at pp. 373–374 (dis. opn. of Breyer, J.).) Speaking for three members of the court, Justice Breyer expressly agreed that, other than the ex post facto concern, the Kansas act was constitutional. (*Id.* at pp. 374–378.)[2] He noted that the "Constitution does not require Kansas to write all of its civil commitment rules in a single statute or forbid it to write two separate statutes each covering somewhat different classes of committable individuals." (521 U.S. at p. 377.)

California's SVPA was enacted a year after Kansas's, and took effect January 1, 1996. (Stats. 1995, ch. 763, § 3, p. 5922.) In many respects, California's SVPA is similar to the Kansas act. (See *Hubbart, supra*, 19 Cal.4th at p. 1153.) As originally written, the SVPA required that, to qualify as a sexually violent predator, a person had to have been convicted of a sexually violent offense against two or more victims. (See *Hubbart, supra*, at p. 1144, fn. 6.) Today, only one victim is required. Accordingly, the SVPA today defines a " 'sexually violent predator' " as "a person who has been convicted of a sexually violent offense against one or more victims and who has a diagnosed mental disorder that makes the person a danger to the health and safety of others in that it is likely that he or she will engage in sexually violent criminal behavior." (Welf. & Inst. Code, § 6600, subd. (a)(1).) This definition is similar to that of the Kansas law reviewed in *Hendricks, supra*,

---

[2] Justice Ginsburg joined the dissent on the ex post facto point and expressed no opinion regarding the other issues. Thus, "at least eight justices found no basis on which to conclude that the act violated Hendricks's due process rights." (*Hubbart, supra*, 19 Cal.4th at p. 1155, fn. 22.)

521 U.S. 346, except that California requires the person to have been convicted of, and not merely charged with, the sexually violent offense. Under the original SVPA, and still today, a person can be confined as a sexually violent predator only after a jury trial (if either party requests a jury) where the state has the burden of proving beyond a reasonable doubt the person is, in fact, a sexually violent predator. (See *Hubbart, supra*, at p. 1147.) Any civil commitment as a sexually violent predator was for a two-year period and could be extended for additional two-year periods only if the state filed a new petition for extended commitment and proved beyond a reasonable doubt at another jury trial (if requested) that the person remained a sexually violent predator. (See maj. opn., *ante*, at p. 1185.)

The California SVPA was accompanied by legislative findings similar to those stated in the preamble to the Kansas law. (See *Hubbart, supra*, 19 Cal.4th at p. 1153.) In an uncodified statement, the California Legislature found and declared "that a small but extremely dangerous group of sexually violent predators that have diagnosable mental disorders . . . are not safe to be at large and if released represent a danger to the health and safety of others in that they are likely to engage in acts of sexual violence." (Stats. 1995, ch. 763, § 1, p. 5921; quoted in full in *Hubbart, supra*, at p. 1144, fn. 5.)

In *Hubbart, supra*, 19 Cal.4th 1138, this court upheld the SVPA's constitutionality against a broad-based attack, including an equal protection challenge. We relied heavily on *Hendricks, supra*, 521 U.S. 346, and explained that equal protection and due process analysis regarding the SVPA is the same under both the United States and the California Constitutions. (*Hubbart, supra*, at p. 1152, fn. 19.) We noted that "*Hendricks* emphasized the importance of deferring to the legislative branch in an area which is analytically nuanced and dependent upon medical science." (*Id.* at p. 1156.) We also explained that the "SVPA is narrowly focused on a select group of violent criminal offenders who commit particular forms of predatory sex acts against both adults and children . . . . The problem targeted by the [SVPA] is acute, and the state interests—protection of the public and mental health treatment—are compelling." (*Id.* at p. 1153, fn. 20.)

The year 2006 saw the enactment of a number of reforms in the law's treatment of sexual predators. "On September 20, 2006, the Governor signed the Sex Offender Punishment, Control, and Containment Act of 2006, Senate Bill No. 1128 (2005–2006 Reg. Sess.) (Senate Bill 1128). (Stats. 2006, ch. 337.) Senate Bill 1128 was urgency legislation that went into effect immediately. (Stats. 2006, ch. 337, § 62.) Among other things, it amended provisions of the SVPA to provide the initial commitment set forth in Welfare and Institutions Code section 6604 was for an indeterminate term. (Stats. 2006, ch. 337, § 55.) All references to an extended commitment in sections 6604

and 6604.1 of the Welfare and Institutions Code were deleted. (Stats. 2006, ch. 337, §§ 55, 56.)" (*Bourquez v. Superior Court* (2007) 156 Cal.App.4th 1275, 1280–1281 [68 Cal.Rptr.3d 142].) In an uncodified statement, the California Legislature found and declared that "[t]he primary public policy goal of managing sex offenders in the community is the prevention of future victimization," and that the Legislature enacted the legislation "[i]n order to accomplish these goals . . . ." (Stats. 2006, ch. 337, § 2(a), (d).) The bill passed by a 40-to-zero vote in the Senate and a 75-to-zero vote in the Assembly. (Sen. Daily J. (Aug. 31, 2006) pp. 5554–5555; Assem. Daily J. (Aug. 30, 2006) pp. 7324–7325.)

The majority correctly explains that "[o]n November 7, 2006, California voters passed Proposition 83, entitled 'The Sexual Predator Punishment and Control Act: Jessica's Law' amending the [SVPA] effective November 8, 2006. Proposition 83 is a wide-ranging initiative that seeks to address the problems posed by sex offenders. It increases penalties for sex offenses, both by altering the definition of some sex offenses and by providing longer penalties for some offenses as well as modifying probation and parole provisions: it requires a GPS tracking device for felons subject to such registration for the remainder of their lives; it prohibits a registered sex offender from living within 2,000 feet of schools and parks; and it changes the [SVPA] by reducing the number of sexually violent offenses that qualify an offender for [sexually violent predator] status from two to one. (See Voter Information Guide, Gen. Elec. (Nov. 7, 2006) analysis of Prop. 83 by Legis. Analyst, pp. 43–44.)" (Maj. opn., *ante*, at p. 1186.)

Proposition 83 also " 'requires that [sexually violent predators] be committed by the court to a state mental hospital for an undetermined period of time rather than the renewable two-year commitment provided for under existing law.' (Voter Information Guide, Gen. Elec. (Nov. 7, 2006) analysis of Prop. 83 by Legis. Analyst, p. 44.)" (*Bourquez v. Superior Court, supra*, 156 Cal.App.4th at p. 1281.) As relevant to the issues before us, Proposition 83 enacted the same reforms as had the Legislature the previous September. (*Bourquez v. Superior Court, supra*, at pp. 1281–1282; *People v. Shields* (2007) 155 Cal.App.4th 559, 562–563 [65 Cal.Rptr.3d 922].)

Proposition 83's findings include the following: "The People find and declare each of the following: [¶] . . . [¶] (b) Sex offenders have very high recidivism rates. According to a 1998 report by the U.S. Department of Justice, sex offenders are the least likely to be cured and the most likely to reoffend, and they prey on the most innocent members of our society. More than two-thirds of the victims of rape and sexual assault are under the age of 18. Sex offenders have a dramatically higher recidivism rate for their crimes than any other type of violent felon. [¶] . . . [¶] (k) California is the only

state, of the number of states that have enacted laws allowing involuntary civil commitments for persons identified as sexually violent predators, which does not provide for indeterminate commitments. California automatically allows for a jury trial every two years irrespective of whether there is any evidence to suggest or prove that the committed person is no longer a sexually violent predator. As such, this act allows California to protect the civil rights of those persons committed as a sexually violent predator while at the same time protect society and the system from unnecessary or frivolous jury trial actions where there is no competent evidence to suggest a change in the committed person." (Voter Information Guide, Gen. Elec. (Nov. 7, 2006) text of Prop. 83, § 2, p. 127; see Historical and Statutory Notes, 47C West's Ann. Pen. Code (2008 ed.) foll. § 209, pp. 52–53.)

Proposition 83's intent clause provides as relevant: "It is the intent of the People of the State of California in enacting this measure to strengthen and improve the laws that punish and control sexual offenders." (Voter Information Guide, Gen. Elec., *supra*, text of Prop. 83, § 31, p. 138; see Historical and Statutory Notes, 47C West's Ann. Pen. Code, *supra*, foll. § 209, p. 53.)

Proposition 83 was approved by a 70.5 percent majority of the voters casting votes on the proposition. (See Cal. Sect. of State, Votes For and Against November 7, 2006 Statewide Ballot Measures <http://www.sos.ca.gov> [as of Jan. 28, 2010].)

As relevant here, the majority accurately summarizes the substance of the 2006 reforms: "In short, under Proposition 83 [and also under the Sex Offender Punishment, Control, and Containment Act of 2006], an individual [sexually violent predator's] commitment term is indeterminate, rather than for a two-year term as in the previous version of the [SVPA]. [A sexually violent predator] can only be released conditionally or unconditionally if the [Department of Mental Health] authorizes a petition for release and the state does not oppose it or fails to prove beyond a reasonable doubt that the individual still meets the definition of [a sexually violent predator], or if the individual, petitioning the court on his own, is able to bear the burden of proving by a preponderance of the evidence that he is no longer [a sexually violent predator]. In other words, the method of petitioning the court for release and proving fitness to be released, which under the former Act had been the way [a sexually violent predator] could cut short his two-year commitment, now becomes the only means of being released from an indefinite commitment when the [Department of Mental Health] does not support release." (Maj. opn., *ante*, at pp. 1187–1188.)

Two recent Court of Appeal opinions have held that the 2006 reforms apply to sexually violent predators who were already civilly committed under

the SVPA. (*Bourquez v. Superior Court, supra,* 156 Cal.App.4th 1275; *People v. Shields, supra,* 155 Cal.App.4th 559.) But various sexually violent predators, including defendant Richard McKee, who was convicted in 1991 of committing lewd acts against an 11-year-old babysitter and in 1998 of committing lewd acts against his eight-year-old niece, have challenged the reforms' constitutional validity. In an opinion originally certified for publication, the Court of Appeal in this case upheld the reforms against defendant's challenges, including an equal protection challenge. We granted review. Since then, six other unanimous Court of Appeal opinions, representing five of California's six appellate districts, have upheld the reforms against all challenges, including equal protection. We have granted review in each case and are holding each pending resolution of this case. (*People v. Johnson,* S164388, review granted Aug. 13, 2008; *People v. Riffey,* S164711, review granted Aug. 20, 2008; *People v. Boyle,* S166167, review granted Oct. 1, 2008; *People v. Garcia,* S166682, review granted Oct. 16, 2008; *People v. Johndrow,* S175337, review granted Sept. 17, 2009; *People v. Rotroff,* S178455, review granted Jan. 13, 2010.) Although our grants of review effectively depublished these opinions (Cal. Rules of Court, rule 8.1105(e)(1)), we may judicially notice our own records. (Evid. Code, §§ 452, subd. (d), 459.) These records show that each of the seven Court of Appeal panels that have decided this issue found that sexually violent predators subject to the SVPA are not situated similarly to persons subject to other civil commitment programs for purposes of the 2006 reforms.

Thus, seven originally published Court of Appeal opinions rejected constitutional challenges to the 2006 reforms, including the equal protection challenge at issue here. Until today, no court has reached a contrary result.

## II. Discussion

Although the majority upholds the 2006 reforms against due process and ex post facto challenges, it finds they potentially violate equal protection principles. I disagree. The reforms are constitutional in all respects.

I will discuss (1) whether the law must treat sexually violent predators the same as others in deciding when to release them into society; (2) the majority's apparent view that every detail of every civil commitment program is subject to strict scrutiny (see maj. opn., *ante,* at pp. 1197–1198, 1210); (3) out-of-state cases which, as will be seen, unanimously reject this or closely similar equal protection contentions; and (4) the evidentiary hearing the majority has mandated.

### A. *Equal Protection*

" ' "The concept of the equal protection of the laws compels recognition of the proposition that persons similarly situated with respect to the legitimate

purpose of the law receive like treatment." ' [Citation.] 'The first prerequisite to a meritorious claim under the equal protection clause is a showing that the state has adopted a classification that affects two or more *similarly situated* groups in an unequal manner.' [Citations.] This initial inquiry is not whether persons are similarly situated for all purposes, but 'whether they are similarly situated for purposes of the law challenged.' [Citation.]" (*Cooley v. Superior Court, supra,* 29 Cal.4th at p. 253.)

An express purpose of the SVPA in general, and the 2006 reforms specifically, is to protect society from sexually violent predators. This is certainly a legitimate purpose. "The problem targeted by the [SVPA] is acute, and the state interests—protection of the public and mental health treatment—are compelling." (*Hubbart, supra,* 19 Cal.4th at p. 1153, fn. 20.) The question before us is whether sexually violent predators are situated similarly regarding this legitimate purpose to persons who are not sexually violent predators.

The majority finds that sexually violent predators are similarly situated for these purposes to persons civilly committed under the Mentally Disordered Offender Act (MDO Act) (Pen. Code, § 2960 et seq.) and that, because the 2006 reforms did not extend to the MDO Act, those reforms potentially violate equal protection.[3] (Maj. opn., *ante,* at p. 1203.) It orders the trial court to conduct an evidentiary hearing to "determine whether the legislative distinctions in classes of persons subject to civil commitment are reasonable and factually based . . . ." (Maj. opn., *ante,* at p. 1210.) If the court on remand finds that the distinction in classes, i.e., the distinction between sexually violent predators subject to civil commitment and others subject to civil commitment, is not reasonable and factually based, the court presumably is to declare the Sex Offender Punishment, Control, and Containment Act of 2006 and Proposition 83 unconstitutional. I disagree. Society can reasonably determine that sexually violent predators present an acute danger that situates them differently than nonsex offenders. As it relates to the 2006 reforms, they are situated differently for purposes of the procedures whereby they are released into society.

The MDO Act, enacted in 1985 (*People v. Allen* (2007) 42 Cal.4th 91, 97 [64 Cal.Rptr.3d 124, 164 P.3d 557]), provides for the civil commitment of mentally disordered offenders who were convicted of one or more of a wide range of crimes. Some of the eligible crimes are sexual offenses, but most are

---

[3] Defendant and the majority also discuss to some extent other civil commitment programs such as those for persons found not guilty of a crime due to insanity. Because these programs are even farther removed from the SVPA than the MDO Act, and the majority concentrates on the MDO Act, I will not discuss the other civil commitment programs. What I say about the MDO Act applies even more strongly to other programs.

not. (Pen. Code, § 2962, subd. (e)(2).) For example, one of the eligible crimes is "[a] crime in which the perpetrator expressly or impliedly threatened another with the use of force or violence likely to produce substantial physical harm in such a manner that a reasonable person would believe and expect that the force or violence would be used. For purposes of this subparagraph, substantial physical harm shall not require proof that the threatened act was likely to cause great or serious bodily injury." (Pen. Code, § 2962, subd. (e)(2)(Q).)

The MDO Act is thus very broad and includes in its coverage a wide range of violent offenders. It is California's general involuntary civil commitment program for mentally disordered offenders. "In contrast, the SVPA," enacted a decade after the MDO Act, "narrowly targets 'a small but extremely dangerous group of sexually violent predators that have diagnosable mental disorders [who] can be identified while they are incarcerated.' (Stats. 1995, ch. 763, § 1, p. 5921.)" (*Cooley v. Superior Court, supra,* 29 Cal.4th at p. 253.) Thus, sexually violent predators are a *particularly dangerous* subset of the broader group of persons who may be civilly committed under the MDO Act. The Legislature and electorate, or both, may validly enact specific provisions concerning this particularly dangerous subset that do not apply to the broader range of persons subject to the MDO Act. Specifically, the Legislature and the electorate may enact rules for releasing sexually violent predators into society that are different than the rules that apply to the general civil commitment program.

The majority cites virtually no authority addressing the question actually before us—whether society may treat sex offenders differently, and less favorably, than nonsex offenders. It relies almost exclusively on general authority that, as relevant here, merely stands for the obvious proposition that civil commitment programs are subject to equal protection principles.[4] *In re Moye* (1978) 22 Cal.3d 457 [149 Cal.Rptr. 491, 584 P.2d 1097], for example, involved the *opposite* situation from this case: treating nonsex offenders *less* favorably than sex offenders. (*Id.* at p. 466.) I will focus, instead, on the specific issue presented.

---

[4] The majority cites only one case finding an equal protection violation that actually involves treating sexually violent predators less favorably than others. (*In re Calhoun* (2004) 121 Cal.App.4th 1315 [18 Cal.Rptr.3d 315]; see maj. opn., *ante,* at p. 1203.) *Calhoun* found an equal protection violation in permitting persons committed under the MDO Act, but not sexually violent predators committed under the SVPA, to refuse antipsychotic medication. (*In re Calhoun, supra,* at pp. 1350–1351.) I need not consider whether *Calhoun* was correct in this regard because it hardly applies here. The exact criteria for medicating mentally disordered offenders is an entirely different matter from the procedures adopted for releasing them into society.

Society—speaking usually through its elected representatives and sometimes directly or, as here, both—has long considered sex offenders different from others and has long prescribed specific remedies for the specific problem they present. For example, many lifetime registration requirements apply to sex offenders that do not apply to other offenders. (Pen. Code, § 290.) Failure of a sex offender to obey these registration requirements can have serious consequences. As the majority opinion recognizes, Proposition 83 itself "is a wide-ranging initiative that seeks to address the problems posed by sex offenders." (Maj. opn., *ante*, at p. 1186.) It requires GPS tracking of sex offenders and prohibits them from living within 2,000 feet of schools and parks. These requirements do not apply to nonsex offenders. All of these requirements are reasonably based on the perception that sex offenders are particularly dangerous. None of them violate equal protection.

The 2006 reforms were limited to addressing the danger that sex offenders pose. They do not address *other* societal problems, such as those posed by mentally disordered offenders governed by the MDO Act. But that circumstance does not make the reforms unconstitutional. Addressing some societal problems but not others in a single piece of legislation does not violate equal protection. "[B]oth the United States Supreme Court and this court have recognized the propriety of a legislature's [or, presumably, the electorate's] taking reform ' "one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind." ' [Citation.] '[A] legislature need not run the risk of losing an entire remedial scheme simply because it failed, through inadvertence or otherwise, to cover every evil that might conceivably have been attacked.' [Citation.]" (*Kasler v. Lockyer* (2000) 23 Cal.4th 472, 488 [97 Cal.Rptr.2d 334, 2 P.3d 581].) Society reasonably believes that sex offenders pose a particularly "acute" problem. (*Hubbart, supra*, 19 Cal.4th at p. 1153, fn. 20.) It can validly address *that* problem without attempting at the same time to address all other problems.

*Hendricks, supra*, 521 U.S. 346, the high court decision that upheld Kansas's Sexually Violent Predator Act, did not specifically address an equal protection challenge. But that does not make the decision irrelevant. Rather, *Hendricks* is instructive. The high court noted that the Kansas Legislature had enacted its act "to grapple with the problem of managing repeat sexual offenders" and had determined that existing civil commitment programs were *inadequate* to confront that problem. (*Hendricks, supra*, at pp. 350–351.) It also noted that "the Kansas Legislature has taken great care to confine only a narrow class of particularly dangerous individuals . . . ." (*Id.* at p. 364.) In the portion of his separate opinion agreeing with the majority, Justice Breyer added that "[t]he Constitution does not require Kansas [or presumably

California] to write all of its civil commitment rules in a single statute or forbid it to write two separate statutes each covering somewhat different classes of committable individuals." (*Id.* at p. 377 (dis. opn. of Breyer, J.).) It should be obvious that if a state enacts a new civil commitment program to deal specifically with sexual offenders because the existing civil commitment programs are inadequate to do so, then the new program will not be identical to the existing programs. Creating a new program identical to an existing inadequate program would accomplish nothing. Rather, the new program will necessarily be different and, in some respects at least, less favorable to sexual offenders than the existing programs. So was the case in Kansas; so is the case in California.

In short, the SVPA seeks to protect the public from sexually violent predators. This purpose is entirely legitimate. Regarding this legitimate purpose, those predators are situated differently from others. The Legislature and the electorate may prescribe rules for their release into society that are different from the rules that apply to California's general, much broader, civil commitment program.

### B. *Strict Scrutiny*

I question whether the 2006 reforms are subject to strict scrutiny rather than review under the more deferential rational basis test. (See generally *People v. Wilkinson* (2004) 33 Cal.4th 821, 836–838 [16 Cal.Rptr.3d 420, 94 P.3d 551].) I recognize that "this court has traditionally subjected involuntary civil commitment statutes to the most rigorous form of constitutional review . . . ." (*Hubbart, supra,* 19 Cal.4th at p. 1153, fn. 20.) But this court has never considered, in an adversarial setting, whether every detail of involuntary civil commitment procedures should be subjected to strict scrutiny.

The belief that strict scrutiny adheres to commitment proceedings like the SVPA can be traced to *In re Moye, supra,* 22 Cal.3d at page 465, which in turn cited *People v. Olivas* (1976) 17 Cal.3d 236, 251 [131 Cal.Rptr. 55, 551 P.2d 375]. *Olivas* involved commitment of juveniles to the California Youth Authority, so it is not on point. But it invoked strict scrutiny because "personal liberty," a "fundamental interest," was at stake. (*Olivas, supra,* at p. 251.) *Moye* cited *Olivas* and said that strict scrutiny applies "[b]ecause petitioner's personal liberty is at stake." (*Moye, supra,* at p. 465.) In *Moye,* the People had conceded that strict scrutiny applied. (*Ibid.*) Because of this

concession, this court has never really grappled with the question. Here, the Attorney General argues that strict scrutiny does not apply, and that the rational basis test should apply. He makes a strong case.

Recently, in *People v. Wilkinson, supra,* 33 Cal.4th 821, we rejected the notion that strict scrutiny applies whenever a statutory classification would subject a person to a greater period of incarceration. (*Id.* at pp. 837–838.) *Wilkinson* was a criminal case and involved a criminal classification. This case involves civil commitments. Nevertheless, *Wilkinson* teaches that we cannot simply say that a classification is subject to strict scrutiny merely because it touches on personal liberty. A person may have a fundamental interest in his or her liberty, but I question whether this fundamental interest extends to all procedures whereby decisions involving personal liberty are made. As I will show in part II.C, *post,* courts from other states that have considered the question have overwhelmingly concluded that strict scrutiny does not apply to equal protection challenges to civil commitment programs.

Sexually violent predators are certainly not a suspect class. Additionally, I question whether a person has a fundamental interest in any particular burden or standard of proof leading to a possible finding that he no longer qualifies as a sexually violent predator. Penal classifications that can lead to greatly enhanced prison sentences are subject to the rational basis test. (*People v. Wilkinson, supra,* 33 Cal.4th at p. 838.) Similarly, a strong argument exists that matters regarding the burden and standard of proof in deciding whether a person is no longer a sexually violent predator should be governed by the rational basis test. To say that a person has a *fundamental interest* in a particular burden or standard of proof trivializes the concept of what is fundamental.

The majority notes that the imposition of *lifetime* registration requirements on sex offenders, but not others, is subject to rational basis review. (Maj. opn., *ante,* at p. 1211, fn. 14.) But, because the stigma attached to the requirements may be great and the penal consequences of failure to register immense, the registration requirements can have a far greater impact on a sex offender's life than the exact procedures of a civil commitment program. To say that the former is subject to rational basis review but the latter to strict scrutiny seems contrived at best.

Ultimately, we do not have to decide the exact test that applies here, because, as I have explained, sexually violent predators are not situated similarly to other offenders for equal protection purposes. Moreover, the high court has not yet expressly decided the point. (See *Heller v. Doe* (1993) 509 U.S. 312, 318–319 [125 L.Ed.2d 257, 113 S.Ct. 2637].) If and when it does

so, this court will presumably follow its lead, as we have stated that equal protection analysis in this regard is the same under both the United States and California Constitutions. (*Hubbart, supra*, 19 Cal.4th at p. 1152, fn. 19.)

## C. *Cases from Other States*

Every case outside of California of which I am aware (neither defendant nor the majority cite any to the contrary) that has considered this or a closely similar equal protection contention has found no violation in treating civilly committed sex offenders less favorably than persons committed under other civil commitment programs. I discuss some of the cases in alphabetical order by state.

The Arizona Court of Appeals rejected the argument that strict scrutiny applies to an equal protection challenge to Arizona's version of the SVPA despite the fact that personal liberty is involved: "We conclude that the rational basis test applies. Petitioners have viewed too expansively the interest at stake. . . . [T]hey have not pointed us to, and we have not found, a fundamental right to have particular procedures apply. The courts that have analyzed equal protection challenges based upon the application of differing sets of rules have applied the rational basis test, even in cases such as this one, where liberty may ultimately be at stake. [Citations.]" (*Martin v. Reinstein* (Ct.App. 1999) 195 Ariz. 293 [987 P.2d 779, 796].) The court also rejected an equal protection challenge to the Arizona act's treating sex offenders differently from those committed under Arizona's general civil commitment statutes. Noting that the Arizona "legislature has found that members of Petitioners' class [i.e., sex offenders] tend to repeat their criminal acts and pose a higher risk of danger to the public than do other classes of mentally ill or mentally disabled persons," the court held "that it was not irrational or unreasonable for the legislature to create a different classification for Petitioners." (*Id.*, 987 P.2d at p. 797.)

The Florida Supreme Court also rejected the argument that strict scrutiny applies to an equal protection challenge to the Ryce Act, Florida's version of the SVPA, despite the fact that personal liberty is involved: "[Petitioner] contends that his fundamental right to liberty is at issue here and, thus, strict scrutiny is the proper standard by which the statute should be measured. However, we conclude that [petitioner] mischaracterizes the nature of his equal protection claim. Even though [petitioner's] liberty may ultimately be at stake, his claim challenges the Legislature's decision to create a special classification for sexually violent predators and to apply special procedures to such involuntary civil commitments. Thus, we conclude that [petitioner's] equal protection claim should be evaluated under the rational basis test." (*Westerheide v. State* (Fla. 2002) 831 So.2d 93, 111, citing *Martin v. Reinstein, supra*, 987 P.2d at pp. 795–798.)

The Florida Supreme Court also rejected an equal protection challenge to the Ryce Act's treating sex offenders differently from those subject to the Baker Act, another civil commitment program. "The Ryce Act serves the dual state interests of providing mental health treatment to sexually violent predators and protecting the public from these individuals. Further, *the act applies equally to all members of the statutory class of 'sexually violent predators.'* [Petitioner's] equal protection argument rests on the false premise that individuals subject to commitment under the Ryce Act are similarly situated to mentally ill persons committed under the Baker Act. The Legislature has clearly stated the reasons for distinguishing sexually violent predators from other mentally ill persons." (*Westerheide v. State, supra,* 831 So.2d at p. 112, italics added.) After citing legislative findings comparable to those concerning California's SVPA, the court "conclude[d] that the specialized treatment needs of sexually violent predators and the high risk that they pose to the public if not committed for long-term control, care, and treatment justify the Legislature's separate classification and treatment scheme. Thus, we find no equal protection violation . . . ." (831 So.2d at p. 112.)

The Illinois Supreme Court held that the Illinois equivalent of California's SVPA "is subject to the rational basis test. . . . The statutory classifications assailed by defendant are not based on race, national origin, sex or illegitimacy, nor do they implicate fundamental rights." (*In re Detention of Samuelson* (2000) 189 Ill.2d 548 [244 Ill.Dec. 929, 727 N.E.2d 228, 236].) It also rejected an equal protection challenge to Illinois's treating sex offenders differently than those subject to commitment under a broader civil commitment act. It held that those who qualify as sexually violent persons "present different societal problems than those whose conduct is subject to the larger, more inclusive class as defined by" the broader civil commitment act. (*Id.,* 727 N.E.2d at p. 237.) "Accordingly, we cannot say that the classification formulated by the legislature is unreasonable." (*Ibid.*)

The Iowa Supreme Court rejected the argument that strict scrutiny applies to an equal protection challenge to Iowa's version of the SVPA, despite the fact that personal liberty is involved: "As the Arizona Court of Appeals recently observed, governmental classifications of the mentally ill have historically been analyzed under the rational basis test even when individual liberty was at stake." (*In re Detention of Williams* (Iowa 2001) 628 N.W.2d 447, 453, citing *Martin v. Reinstein, supra,* 987 P.2d at p. 796.) It also rejected an equal protection challenge to Iowa's treating sex offenders differently from those subject to commitment under other laws. "The legislation under review plainly states the reasons for distinguishing between mentally ill sex offenders and other mentally ill persons." (*Williams, supra,* at p. 453.) After citing legislative findings comparable to those concerning California's SVPA, the court concluded that the distinction between sexually

violent predators and those committed under another provision "dictates different treatment, both in method and duration. As this court noted in [another case], '[t]he particularly devastating effects of sexual crimes on victims, and the offenders' need for specialized treatment provide a rational basis for the classification.' [Citation.] So also here, the specialized treatment needs of [sexually violent predators], when compared to others who suffer from different mental abnormalities, justify the different classification and treatment chosen by the legislature." (*Williams*, at p. 454.)

The Missouri Supreme Court was one of the few to subject a law comparable to the SVPA "to strict scrutiny because it affects the fundamental right of liberty." (*In re Care and Treatment of Coffman* (Mo. 2007) 225 S.W.3d 439, 445.) Nevertheless, the court rejected an equal protection challenge similar to the one here. In that case, the petitioner, who had already been determined to be a sexually violent predator, sought to be released from civil commitment. Under the Missouri law, in order to obtain a jury trial, he had to either (1) receive authorization from the director of the department of mental health, or (2) show by a preponderance of the evidence that he should be released. (*Id.* at p. 443.) The petitioner argued "that the requirement that he demonstrate his entitlement to release by a preponderance of the evidence violates equal protection because '[n]o other person involuntarily civilly committed must make a preliminary showing to a trial court of facts "warranting" a second trial[.]' " (*Id.* at p. 445.) The court disagreed. "This argument ignores the fact that persons who are committed as sexually violent predators are committed because they are 'distinctively dangerous' to society. [Citation.] Because the basis for commitment of sexually violent predators is different from general civil commitments, there is no requirement that sexually violent predators be afforded exactly the same rights as persons committed under the general civil standard. [Citation.] The requirement that a sexually violent predator demonstrate his initial right to release by a prepon-derance of the evidence is narrowly tailored to the state's interest in keeping people committed if it is more likely than not that they will commit sexually violent crimes if released. The . . . statute does not violate the equal protection clause." (*Ibid.*)

The North Dakota Supreme Court did not decide what level of scrutiny North Dakota's equivalent of the SVPA should receive because the North Dakota law "survives [the] equal protection challenge under even the highest level of scrutiny." (*In re P.F.* (2008) 2008 ND 37 [744 N.W.2d 724, 731].) "There are important differences between those committed because the court has determined they are sexually dangerous and those committed because of mental illness or chemical dependency." (*Id.*, 744 N.W.2d at pp. 731–732.) "The potential level of danger these two groups pose to society is different. Sexually dangerous individuals are distinctively dangerous due to the high

probability that they will commit further acts of sexually predatory conduct if not confined in a secure facility." (*Id.* at p. 732.) "The State has a compelling interest in protecting the public, and that interest justifies treating sexually dangerous individuals differently." (*Ibid.*) "The heightened risk sexually dangerous individuals pose and the State's compelling interest in protecting the public justify the classification and differences in the treatment of sexually dangerous individuals, and the distinct procedures and safeguards further the State's interest in protecting the public." (*Id.* at p. 733.) Accordingly, the court found no equal protection violation in treating sexually dangerous persons differently than others. (*Ibid.*)

The South Carolina Supreme Court applied the rational basis test to an equal protection challenge to South Carolina's equivalent of the SVPA. (*In re Treatment and Care of Luckabaugh* (2002) 351 S.C. 122 [568 S.E.2d 338, 351].) Citing with approval *In re Detention of Williams, supra,* 628 N.W.2d 447, the court also rejected the challenge. "To require the Legislature to treat the two groups [sexually violent predators and those committed under another civil commitment process] similarly would require overruling a rational determination that sexually violent predators have certain characteristics which make their treatment needs different from other involuntarily committed individuals. The potential danger to the community provides a rational reason why sexually violent predators should be treated differently than other committed patients. The classification is not plainly arbitrary, but, instead, is reasonable in light of the differences between the two groups. [Citation.]" (*Luckabaugh, supra,* at p. 352.)

Washington applies the rational basis test to equal protection challenges to its version of the SVPA. (*In re Detention of Stout* (2007) 159 Wn.2d 357 [150 P.3d 86, 96].) The Washington Court of Appeals rejected an equal protection challenge quite similar to the one of this case. "[Appellant] argues that the differences . . . in the release procedures violate his right to equal protection. . . . [¶] There is a rational basis for treating sexually violent predators and other mentally ill persons differently with respect to release procedures. . . . [D]ifferences in dangerousness, treatment methods, and prognosis for the mentally ill and violent sex offenders justify treating the two groups differently. [¶] . . . [A]llowing those committed under [the civil commitment statute for other mentally ill persons] to be released solely on the recommendation of the superintendent but requiring a show cause and a full evidentiary hearing before sexually violent predators are released does not violate equal protection." (*Petersen v. State* (2000) 104 Wn.App. 283 [36 P.3d 1053, 1057], fns. omitted.)

The Wisconsin Supreme Court declined to decide whether strict scrutiny or rational review applies to an equal protection challenge to Wisconsin's

version of the SVPA because it was not necessary to do so. (*State v. Post* (1995) 197 Wis.2d 279 [541 N.W.2d 115, 130].) It considered an equal protection challenge to the release procedures that apply in Wisconsin to sexually violent persons, which are closely similar to the California procedures challenged in this case, and which, like the analogous California procedure, are more stringent than the procedures under Wisconsin's general civil commitment statute. (*Id.*, 541 N.W.2d at p. 128, fn. 22.) It then rejected that challenge: "[T]he people can choose, through their duly elected representatives, to address complex social problems in more than one way. . . . [¶] . . . The legislature has determined that, as a class, persons predisposed to sexual violence are more likely to pose a higher level of danger to the community than do other classes of mentally ill or mentally disabled persons. This heightened level of dangerousness and the unique treatment needs of sexually violent persons justify distinct legislative approaches to further the compelling governmental purpose of protection of the public." (*Id.* at p. 130.)

### D. *The Evidentiary Hearing*

The majority today orders a superior court judge to conduct an evidentiary hearing to decide whether society may take steps to protect itself from sexually violent predators that differ from steps it takes regarding persons subject to California's general involuntary civil commitment program. At the hearing, "[t]he trial court may, if appropriate, permit expert testimony." (Maj. opn., *ante*, at p. 1209.) The purpose of the hearing, according to the majority, is to give the government the opportunity to demonstrate that the 2006 reforms are "based on a reasonable perception of the unique dangers that [sexually violent predators] pose rather than a special stigma that [sexually violent predators] may bear in the eyes of California's electorate." (Maj. opn., *ante*, at p. 1210.) (The majority opinion should, but does not, add "and the California Legislature.")

At the evidentiary hearing, however, the court apparently is not to resolve any factual dispute in the way courts normally do. The majority adds that "mere disagreement among experts will not suffice to overturn the Proposition 83 amendments [and, presumably, the Legislature's amendments]. The trial court must determine whether the legislative distinctions in classes of persons subject to civil commitment are reasonable and factually based—not whether they are incontrovertible or uncontroversial." (Maj. opn., *ante*, at pp. 1210–1211.)

Fortunately, I will not be the trial judge who has to try to make sense of these pronouncements on remand, but apparently the trial court will not be allowed to resolve a factual dispute among experts. Indeed, the majority seems to give the trial court discretion to prohibit expert testimony entirely,

for it says that the court "may" admit such testimony "if appropriate." The majority does not suggest under what circumstances expert testimony might be inappropriate, but noting that expert testimony might be admitted if appropriate implies that nonexpert testimony might be appropriate instead. If expert testimony is found inappropriate, what kind of testimony *would* be appropriate? Anecdotal evidence about particular sexually violent predators who, in the view of the witness, either are or are not as dangerous as sexually violent predators? Or, conversely, anecdotal evidence about particular persons subject to the MDO Act who, in the view of the witness, either are or are not as dangerous as sexually violent predators? Or perhaps testimony from a person who was (or was not) the victim of a sexual crime that, in the witness's view, sexually violent predators in general either are or are not particularly dangerous? None of this would be helpful, and surely either side could find plenty of witnesses to supply whatever testimony of that kind it desired.

The majority states it is not contemplating the use of nonexpert testimony. (Maj. opn., *ante*, at pp. 1209–1210, fn. 12.) That is reassuring, but if so, it seems the hearing on remand will necessarily turn on expert testimony. Whether society should treat sex crimes and their perpetrators differently from those who commit other crimes, however, is a judgment call for society to make, not a "fact" for a judge to determine after an evidentiary hearing. In *Powell v. Texas* (1968) 392 U.S. 514 [20 L.Ed.2d 1254, 88 S.Ct. 2145], the United States Supreme Court rejected a constitutional challenge to making public intoxication a crime. There, the trial court, in invalidating the law, purported to make factual findings that alcoholism is a disease that a person cannot control. The high court rejected those findings: "Whatever else may be said of them, those are not 'findings of fact' in any recognizable, traditional sense in which that term has been used in a court of law . . . ." (*Id.* at p. 521.) Similarly, whether the California Legislature, the California electorate, and legislatures throughout the country may reasonably treat sex offenders as a separate category with separate remedies is not a *fact* comparable to other facts that trial courts determine. Neither sociology nor penology is an exact science. This court and the high court have already described sexually violent predators as " 'extremely dangerous' " (*Cooley v. Superior Court, supra*, 29 Cal.4th at p. 253) or "particularly dangerous" (*Hendricks, supra*, 521 U.S. at p. 364). An evidentiary hearing cannot change that.

Moreover, the victims of sexual crimes are especially likely to be traumatized because, as the Iowa Supreme Court noted, sexual crimes have " 'particularly devastating effects' " on the victims. (*In re Detention of Williams, supra*, 628 N.W.2d at p. 454.) The exact nature of these effects and this

traumatization cannot be quantified at an evidentiary hearing, but I reject the notion that a single judge could conclude that it is unreasonable to view the traumatizing effects of sexual crimes as different from the effects of other crimes.

In upholding Kansas's version of the SVPA, the high court stressed that legislatures must be given the widest latitude to legislate in areas fraught with medical and scientific uncertainty. (*Hendricks, supra,* 521 U.S. at pp. 360, fn. 3, 370.) That describes this situation. How to treat sex crimes is "analytically nuanced" and, as such, we must defer to the legislative branch. (*Hubbart, supra,* 19 Cal.4th at p. 1156.) The California Legislature and electorate must be given the widest latitude to legislate in this area, which is why the high court upheld Kansas's SVPA, and why courts throughout the nation have upheld their states' versions of the SVPA.

The majority cites some specific factual statements by Proposition 83's proponents and the proponents' reference to a "1998 report" as also warranting an evidentiary hearing. (Maj. opn., *ante,* at p. 1206.) I disagree for two reasons. First, the issue before us is whether society may treat sex offenders differently from other offenders, not whether specific factual claims by proponents of legislation are correct. Second, the *Legislature* did not rely on those findings and that report when it enacted the Sex Offender Punishment, Control, and Containment Act of 2006. Thus, even if a perceived inaccuracy in the factual findings cited by Proposition 83's proponents would provide a reason to overturn that initiative measure, the inaccuracy would provide no reason to overturn the Legislature's identical provisions.

The majority acknowledges only obliquely, in a footnote near the end of its opinion, that the Legislature also enacted the reforms the majority finds potentially invalid. (Maj. opn., *ante,* at pp. 1209–1210, fn. 12.) Then it gets technical. It says, "The People have not addressed whether the legislative history of that statute contains any justification for treating [sexually violent predators] differently from [mentally disordered offenders] and may do so on remand." (*Id.* at p. 1210, fn. 12.) (However, the majority also directs the Court of Appeal to remand the matter to the trial court for further proceedings consistent with its opinion, i.e., for an evidentiary hearing. (Maj. opn., *ante,* at p. 1211.) Thus, it is not clear when the People are supposed to have the opportunity to defend the Legislature's actions.) I agree the People have not made a separate argument that the Sex Offender Punishment, Control, and Containment Act of 2006 is valid even if Proposition 83 is invalid. Such an argument would seem unnecessary given that the two provisions are identical as relevant here. But at least the People have noted that both the Legislature and the electorate enacted the reforms at issue. Defendant never even cites

the Legislature's actions. If we are to get technical, I suppose we would have to say that defendant challenges only Proposition 83, and not also the Legislature's enactment of the same reforms. If so, today's opinion only could endanger Proposition 83 and not also the Legislature's reforms. It may seem absurd to invalidate one but not the other, given that they are identical, but that seems to be the necessary consequence of the majority's refusal to confront directly the fact that the legislation it finds potentially unreasonable was enacted by *both* the Legislature and the electorate.

The majority confidently asserts that any ruling invalidating the reforms of 2006 would not endanger the constitutional validity of other ways in which society has treated sex offenders differently from others, for example, by imposing lifetime registration requirements. (Maj. opn., *ante*, at p. 1211, fn. 14.) I hope future potential litigants and courts will heed this assertion. But if the result of the mandated evidentiary hearing is the trial court's finding that the 2006 reforms are *not* "based on a reasonable perception of the unique dangers that [sexually violent predators] pose," but rather are based on "a special stigma that [sexually violent predators] may bear in the eyes of California's electorate [and the Legislature]" (maj. opn., *ante*, at p. 1210)— and thus the 2006 reforms violate equal protection guarantees—it is hard to imagine how society could reasonably impose lifetime registration requirements on those same persons that are not imposed on others.

I need not resolve this conundrum, because I believe the law may use different procedures for deciding when to release sexually violent predators into society than it uses regarding other civilly committed persons. No evidentiary hearing can invalidate this legislative choice.

### III. Conclusion

The majority has empowered a single superior court judge to find unreasonable all of the following: the unanimous judgment of both branches of California's Legislature; the overwhelming judgment of the California electorate; the judgment of legislatures throughout the nation; and the decision of the United States Supreme Court approving of the Kansas Legislature's determination that sexually violent predators present risks that the state's general involuntary commitment procedure was inadequate to address. This action is contrary to the unanimous judgment of all seven Court of Appeal opinions that considered this precise question in originally published opinions, as well as the judgment of courts around the nation that have rejected equal protection challenges to their states' equivalent of the SVPA. I cannot agree. Whether sexually violent predators present a distinct danger warranting unique remedies is for society to determine, not a trial judge.

Accordingly, I dissent from the majority's equal protection holding. I would affirm entirely the judgment of the Court of Appeal.

Baxter, J., concurred.

Appellant's petition for a rehearing was denied March 10, 2010. Baxter, J., and Chin, J., were of the opinion that the petition should be granted.