Filed 8/12/15  P. v. Hipp CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FIFTH APPELLATE DISTRICT**

| | |
|---|---|
| THE PEOPLE, | F068846 |
| Plaintiff and Respondent, | (Super. Ct. No. TCF041136-92) |
| v. | |
| ROY LEE HIPP, | **OPINION** |
| Defendant and Appellant. | |

-ooOoo-

**THE COURT**[*]

APPEAL from an order of the Superior Court of Tulare County.  H.N. Papadakis, Judge.  (Retired judge of the Fresno Super. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.)

Michael B. McPartland, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Michael P. Farrell, Assistant Attorney General, Daniel B. Bernstein and Peter H. Smith, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

[*]	Before Kane, Acting P.J., Detjen, J. and Smith, J.

**INTRODUCTION**

Appellant Roy Lee Hipp contends the trial court abused its discretion when it admitted evidence of two murders and an attempted murder committed by Hipp in 1977. This evidence was admitted during the civil commitment trial held to determine if Hipp qualified as a sexually violent predator (SVP) pursuant to the Sexually Violent Predators Act (SVPA; Welf. & Inst. Code, § 6600 et seq.).[1] We conclude there was no abuse of discretion.

**FACTUAL AND PROCEDURAL SUMMARY**

On June 11, 2007, a petition to civilly commit Hipp pursuant to the SVPA was filed. The petition alleged Hipp fit within the statutory definition of an SVP. The petition also alleged Hipp had been convicted of the following predicate offenses: one count of forcible rape and one count of oral copulation in 1983 and two counts of sexual penetration with a foreign object and one count of lewd conduct with a child in 1992. The petition also alleged Hipp admitted, in conjunction with the 1992 convictions, that he had been convicted of two prior serious felony offenses.

On December 3, 2007, following a hearing, the trial court found probable cause to believe Hipp fell within the statutory definition of an SVP. On January 7, 2010, pursuant to a stipulation of the parties, the trial court ordered new evaluations be conducted pursuant to section 6601. On January 10, 2011, following a hearing, the trial court again found probable cause that Hipp met the statutory definition of an SVP.

A jury trial commenced on December 3, 2013. Over Hipp's objection, the People were allowed to introduce evidence that in 1977 Hipp allegedly raped his then girlfriend, L., after murdering her parents and attempting to murder a family friend. Hipp was 17 years old at the time. L. testified that on December 7, 1977, she was living with her

---

[1]All further statutory references are to the Welfare and Institutions Code unless otherwise specified.

2.

parents. Her parents and a family friend, Hoyt, were in her parents' home; L. and Hipp were in a separate building on the property.

Sometime between 10:00 p.m. and 11:00 p.m., L. heard her mother calling her; Hipp left and L. went to the residence where her parents and Hoyt were located and went to bed. A short time later, L. heard Hipp calling her name. L. got up, got dressed, and went to the front room. When she got there, Hipp told her someone had come into the house and had shot everyone. L. could see that her father and Hoyt had gunshot wounds.

Hipp was carrying a gun. He took L. outside and had her walk with him to a location where he tossed the gun into some bushes. Hipp also had a knife with him. He slapped L. in the face several times. Hipp told L. he was the one who had shot her parents and then forced her to have sex with him. L. remembered thinking, "I hope I get through this. I hope I don't end up in a ditch dead somewhere." After they dressed, they returned to L.'s parents' house.

When they got to L.'s parents' house, the police were there and they separated L. and Hipp. L. told the police that Hipp had shot her parents. L. took officers to where Hipp had tossed the gun. L. did not tell the police that Hipp had raped her because she was "scared and confused" and the rape was "too personal." L. felt "ashamed" and confided only to one close friend about what had happened.[2]

On March 28, 1978, Hipp was found guilty of two counts of second degree murder for the killing of both of L.'s parents and one count of attempted murder for the shooting of Hoyt, who survived. Hipp was committed to a juvenile facility; he was released on July 20, 1981.

---

[2]The rape was reported nearly 36 years after the event during a followup interview with two district attorney investigators in preparation for the December 2013 SVP hearing.

M.Y. testified to the prior sexual offenses Hipp committed against her. In 1983, M.Y. was 17 years old; her cousin was married to Hipp's brother. On September 3, 1983, M.Y. was at her cousin's house for a family gathering; Hipp also was present.

Around 9:00 p.m. Hipp told M.Y. he needed to talk with her in the backyard. Once in the backyard, Hipp told M.Y. he had to collect some marijuana from a nearby orchard; M.Y. agreed to go with him. When they entered the orchard, Hipp threw M.Y. to the ground and yelled, "This is a rape."

Hipp beat M.Y. with his fists and belt. He forced M.Y. to remove all her clothes and tied his belt around her neck. He used the belt to drag her to different places in the orchard and a nearby field; Hipp repeatedly raped her and made her orally copulate him. Hipp called her a "whore" and a "slut" and beat her so badly on her legs with his belt that bruises formed from her knees to her buttocks that lasted over three months. As he was hitting her, Hipp made M.Y. beg to be hit with the belt, as well as call him "daddy."

Hipp made M.Y. beg for her life and promise repeatedly that she would not report the incident to the authorities or else Hipp would kill her and her family. Hipp took M.Y. back to her cousin's house around 6:00 a.m. and made her wait outside, naked, while he went into the house, got his girlfriend, and left. Once he left, M.Y. went inside and took a shower. Someone else called the police when they saw how badly she had been beaten.

In addition to the bruising on her legs, M.Y. had bruising around her neck as a result of the belt being used as a leash. She had knots on her head and her mouth and face were bruised and cut.

On September 20, 1983, Hipp pled guilty to one count of forcible rape and one count of forcible oral copulation as a result of his sexual assault on M.Y. He was sentenced on November 17, 1983, to 16 years in prison for these offenses.

In 1992, Hipp inappropriately touched J.W., who was 14 years old at the time.

In June of 1992, S.W. was 18 years old and living with her boyfriend, Michael, and their one-year-old daughter. Hipp is Michael's uncle. One evening in June Hipp was

4.

at Michael's home when Michael left around 10:00 p.m. to go to the corner store to buy cigarettes and diapers.

After Michael left the house, Hipp walked directly in front of S.W. with his penis out of his pants and asked her if she cheated on Michael. S.W. asked Hipp what he was doing. Hipp responded by ripping open S.W.'s blouse and beating her about the head with his fists. He told her that if she screamed he would kill her. Eventually, S.W. said, "Okay, … whatever you want" to stop him from hitting her. Hipp grabbed her and pulled her to the floor, pulled off her pants and underwear, and said, "Let's go."

S.W. managed to crawl to the front door with Hipp on her back, but she struggled to open the door because Hipp had fastened the chain lock. As she tried to open the door, Hipp scratched and clawed at her vagina with his hands. Finally, S.W. managed to open the door and ran toward a neighbor's house and banged on the door for help. As she did so, she realized her daughter was on her front porch, crying. She ran back and grabbed her daughter and again ran toward a neighbor's house. At that point Michael returned and they called the police.

As a result of the attack, S.W. sustained numerous knots and bruises on her head, bald spots on her head where Hipp had ripped out her hair, and cuts and claw marks inside her vagina.

On June 30, 1992, Hipp pled no contest to two counts of sexual penetration with a foreign object as a result of his sexual attack on S.W. and no contest to one count of lewd conduct with a minor as to J.W. Hipp also admitted two prior serious felony allegations. On July 14, 1992, Hipp was sentenced to 29 years in state prison.

Dr. Dawn Starr, a licensed psychologist, testified for the People. Starr first interviewed Hipp for an SVP evaluation in May 2007. As part of the evaluation process, she reviewed Hipp's hospital, criminal, and prison records. Starr also completed six updates of Hipp's SVP evaluation.

Starr testified that Hipp had the requisite, qualifying predicate offenses, which included the offenses with M.Y., S.W., and J.W. Pursuant to the fourth edition of the Diagnostic and Statistical Manual of Mental Disorders (DSM) and the Psychopathy Checklist Revised, Starr concluded that Hipp currently suffered from mental disorders of paraphilia not otherwise specified (paraphilia NOS), antisocial personality disorder with narcissistic features, and substance dependence disorder that contributed to his criminal offenses.

A person who suffers from paraphilia NOS has recurrent intense sexually arousing fantasies, urges, or behaviors, generally directed toward nonconsenting people. A person who suffers from a personality disorder tends to have thoughts or behaviors that deviate markedly from society's norm. That behavior typically involves criminal conduct, starts in adolescence, and continues to be lifelong. The antisocial and narcissistic personality disorders are the most severe and tend to predispose people to act in a variety of aggressive and manipulative ways toward others.

Starr opined that because Hipp's offenses against M.Y. occurred shortly after he was released from incarceration, and the offenses against J.W. and S.W. were committed while Hipp was on parole, and in each instance the victims could readily identify him, Hipp had an underlying drive to commit sexual offenses based on urges or fantasies. Starr opined that Hipp's sexual assault of L. after he murdered her parents also provided corroboration of the sexual component of the diagnosis. Starr had suspected that Hipp's conduct in 1977 was motivated by something sexual. Starr opined that Hipp's committing two murders, an attempted murder, and a sexual assault at the age of 17 supported her diagnosis that Hipp suffered from an antisocial personality disorder.

Starr opined that based upon Hipp's diagnosed mental disorders, Hipp was likely to reoffend in a sexually violent manner if he were released from custody. Starr concluded that Hipp had difficulty controlling his sexual impulses due to his paraphilia. With his personality disorder, Hipp was prone to criminal conduct; Hipp made excuses

6.

for his prior sexual offenses. Because of his personality disorder, Hipp expected preferential treatment and took whatever he wanted to meet his needs.

Although Hipp had gone to treatment, Starr was concerned because Hipp had dropped out of treatment twice. Hipp also told Starr he had no intention of going to sex offender treatment if released into the community because he believed he had received sufficient treatment. Starr also was concerned because drugs and alcohol had factored into Hipp's criminally sexual conduct, but Hipp was reluctant to join substance abuse treatment.

Starr opined that there was nothing about Hipp's "present personality functioning or his level of understanding of what caused him to commit his sexual crimes or his level of honesty" that would lead Starr to conclude there would be "any different result if he were released into the community at this time."

The defense presented evidence from five medical professionals: Drs. Robert Owen, Amy Phenix, Clark Clipson, Dale Arnold, and Hilary Trytten. Owen, a clinical psychologist, reviewed Hipp's hospital and criminal records and evaluated Hipp in 2007. At that time, Owen determined Hipp had an antisocial personality disorder and a dependence disorder, but Owen concluded Hipp did not suffer from a mental disorder that predisposed Hipp to offend sexually. Since Owen was of the opinion Hipp did not have a diagnosed mental disorder that predisposed him to offend sexually, Owen concluded Hipp did not qualify as an SVP.

Phenix, a licensed psychologist, examined Hipp on September 27, 2013. Phenix opined that Hipp suffered from stimulant use disorder, severe in a controlled environment, and moderate alcohol use disorder, neither of which qualified Hipp as an SVP. Phenix acknowledged that Hipp's attacks on L., M.Y., J.W., and S.W. were typical of sex offenders, but she opined that Hipp's sexual attacks were not the result of recurrent sexual fantasies; rather, his attacks were motivated by anger, revenge, or substance abuse.

7.

Clipson, a licensed psychologist, evaluated Hipp in 2007 and concluded he suffered from sexual sadism, a form of paraphilia, and qualified as an SVP. Clipson again evaluated Hipp in 2010, this time concluding Hipp did not meet the criteria for an SVP; rather, Clipson concluded Hipp had anger management problems.

Arnold also had evaluated Hipp and noted that based upon actuarial analysis, Hipp was a high-risk sex offender. Arnold, however, did not believe deviant sexual fantasies were causing Hipp's behavior; rather, they were spontaneous acts caused by situational factors. Arnold concluded Hipp did not qualify as an SVP.

Trytten, a psychologist, treated Hipp at Coalinga State Hospital in the sex offender treatment program for over two years. According to Trytten, Hipp had been open about his crimes, acknowledged what he had done was wrong, and knew what he needed to do in order not to engage in that behavior again.

On December 13, 2013, the jury found Hipp to be an SVP. The trial court ordered Hipp committed for appropriate treatment and confinement for an indefinite period pursuant to section 6604.

## DISCUSSION

Hipp's sole contention on appeal is that the trial court erred prejudicially and violated his right to due process when it admitted evidence of his 1977 crimes over his Evidence Code section 352 objection. We disagree.

### *Factual Summary*

The People filed a written motion to introduce evidence of Hipp's 1977 murder and attempted murder convictions, as well as the uncharged rape of L. The People asserted the evidence of the 1977 convictions and uncharged rape were relevant to a determination of whether Hipp currently suffered from a diagnosed mental disorder of paraphilia and antisocial personality disorder and thus was a risk of reoffending. The People also argued that the proposed evidence was more probative than prejudicial and was no more confusing than the evidence pertaining to the predicate offenses.

8.

On November 15, 2013, Hipp filed a written motion to exclude evidence of the 1977 offenses, contending the evidence was irrelevant under Evidence Code section 210 and should be barred under Evidence Code sections 352 and 1101.

The People filed written opposition to Hipp's motion, contending Evidence Code section 1101 was inapplicable to SVP civil commitment proceedings, and that evidence of the 1977 offenses was more probative than prejudicial because it tended to prove Hipp suffered from mental disorders and would reoffend if released.

On November 26, 2013, the trial court ruled that the uncharged rape of L. in 1977 was admissible at the SVP trial. On the following day the trial court addressed admission of the 1977 criminal convictions, expressing concern about their admission, but reserving a ruling until after each party had had an opportunity to submit supplemental briefing.

The People filed a supplemental brief on December 2, 2013, arguing that evidence of the 1977 criminal convictions should be admitted because mental health evaluators are required to consider the information by statute and regulations, and the evidence supported the diagnosis of paraphilia and antisocial personality disorder. After reviewing the supplemental brief, the trial court ruled on December 4 that evidence of the 1977 criminal convictions were admissible.

*Analysis*

The purposes of the SVPA are """"to protect the public from dangerous felony offenders with mental disorders and to provide mental health treatment for their disorders."""" (*State Dept. of State Hospitals v. Superior Court* (2015) 61 Cal.4th 339, 344.) In order to civilly commit a person pursuant to the SVPA, the People must prove that the person "has been convicted of a sexually violent offense against one or more victims and who has a diagnosed mental disorder that makes the person a danger to the health and safety of others in that it is likely he or she will engage in sexually violent criminal behavior." (§ 6600, subd. (a)(1); see *People v. McKee* (2010) 47 Cal.4th 1172, 1186.)

Prior to filing a petition to civilly commit someone as an SVP, the person is to be referred for evaluation in accordance with section 6601, subdivision (a)(1). Section 6601, subdivision (b) provides that the Department of Corrections and Rehabilitation (the Department) shall screen inmates to determine if an inmate may qualify as an SVP. In conducting a screening, the Department is to review the person's social, criminal, and institutional history. If as a result of the screening the Department determines the person may qualify as an SVP, the Department is to refer the person for a full evaluation. (*Ibid.*)

Section 6601, subdivision (c) specifically states that the person shall be evaluated "in accordance with a standardized assessment protocol," which protocol "shall require assessment of diagnosable mental disorders, as well as various factors known to be associated with the risk of reoffense among sex offenders. Risk factors to be considered *shall include* criminal and psychosexual history, type, degree, and duration of sexual deviance, and severity of mental disorder." (Italics added.) The evaluations are to be conducted by two practicing psychiatrists or psychologists. (*Id.*, subd. (d).)

The provisions of section 6601, subdivision (c) require the evaluating psychologist or psychiatrist to consider a person's criminal record to determine if the person qualifies as an SVP.

Starr conducted an evaluation of Hipp for purposes of determining if he qualified as an SVP. During the trial, Starr testified she believed that two murders and an attempted murder had a sexual component to them based upon Hipp's earlier answers to questions about the murders. Starr's suspicion was corroborated by L.'s subsequent disclosure of being raped by Hipp minutes after Hipp killed her parents. Starr had prepared a summary of his criminal record, including the murders he committed as a juvenile, in preparing her evaluation.

Owen, who testified for the defense, also stated that he would have considered evidence of a murder in making a diagnosis of a mental disorder if the surviving daughter of the murder victims had been raped minutes later by the murderer.

10.

Moreover, in conducting an evaluation, the psychologist determines if the person has a mental disorder, as described in the DSM, that might predispose the person to commit sexual offenses.  For a DSM diagnosis of antisocial personality disorder, the psychologist looks at (1) whether the person has engaged in a pattern of behaviors that deviate from societal norms, often in criminal conduct, (2) whether this pattern began in adolescence and has continued, (3) aggressive behavior toward others, (4) lying, (5) being deceitful, and (6) lack of empathy toward others.  A person with antisocial personality disorder is prone to criminal conduct.

The 1977 murders were not, as Hipp contends, irrelevant simply because of passage of time.  Clearly, the murders committed when Hipp was 17 years old were relevant to Starr's diagnosis—they were committed while Hipp was an adolescent, they evidenced aggressive behavior against several people, and it was the start of the pattern of behavior that deviated from societal norms and that constituted criminal conduct.  Starr called this a "bizarre crime for a 17-year-old to commit."  Starr testified that the commission of two murders, an attempted murder, and a sexual assault at the age of 17 by Hipp supported the diagnosis of antisocial personality disorder and that antisocial personality disorder generally manifested first in adolescence.  Passage of time does not make the murders irrelevant to the diagnosis.

Since section 6601, subdivision (c) requires the evaluating psychologist to consider the person's criminal behavior, and the 1977 murders were relevant to a diagnosis under the DSM of antisocial personality disorder, it follows that the evidence of the 1977 murders was relevant under Evidence Code section 210 as it had a tendency to prove a disputed fact -- whether Hipp met the criteria for an SVP.

As for Hipp's Evidence Code section 352 challenge, the evidence of the murder and attempted murder convictions was not unduly prejudicial.  Evidence is unduly prejudicial when it "tends to evoke an emotional bias against a party as an individual, while having only slight probative value with regard to the issues."  (*People v. Samuels*

(2005) 36 Cal.4th 96, 124.)  As Starr testified, the 1977 convictions were relevant to establishing the diagnosis of antisocial personality disorder.  Relevant evidence "'will not offend due process unless the evidence is so prejudicial as to render the defendant's trial fundamentally unfair.'"  (*People v. Jablonski* (2006) 37 Cal.4th 774, 805.)

The test for undue prejudice is not whether the evidence tends to establish guilt or it adversely impacts the defense, but whether the evidence tends to inflame the jurors and motivate them to punish the defendant because of an emotional reaction.  (*People v. Valdez* (2012) 55 Cal.4th 82, 145.)  We see no indication in the record this was the case.

Section 6600, subdivision (a)(3) requires the jurors be instructed on the limited role of evidence of prior offenses.  The jurors were so instructed in this case.  Hipp has cited no portion of the record that would indicate the jurors failed to comply with the jury instructions.  In the absence of any evidence to the contrary, we presume the jury followed the instructions.  (*People v. Prince* (2007) 40 Cal.4th 1179, 1195.)

Nor does this appear to have been a "close case" as Hipp asserts.  Although multiple psychologists testified, the jury did not appear to have difficulty evaluating the evidence and applying it to the law as set forth in the jury instructions; they deliberated approximately six hours before returning a verdict.  Of the questions asked by the jury, one was for the testimony of Starr discussing the definition of paraphilia NOS and the other for a definition of the term "menace."  The trial court responded to both questions. No questions were asked that pertained to the murder convictions.

## DISPOSITION

The December 13, 2013, commitment order is affirmed.

12.